Billy McKINNEY, Appellant,

v.

STATE of Alaska, Appellee.

No. 2758.

Supreme Court of Alaska.

July 8, 1977.

Rehearing Granted Nov. 4, 1977.

---

654

Walter L. Carpeneti, Asst. Public Defender, Juneau, and Brian Shortell, Public Defender, Anchorage, for appellant.

Larry Weeks, Dist. Atty. and Avrum M. Gross, Atty. Gen., Juneau, for appellee.

Before BOOCHEVER, C. J., RABINOW-ITZ, CONNOR and BURKE, JJ., and DI-MOND, J. Pro Tem.

## OPINION

BOOCHEVER, Chief Justice.

Billy McKinney was indicted for assault and stabbing with intent to kill in violation of AS 11.15.160[1] and AS 11.15.150.[2] Admitting the acts charged, he claimed insanity and incompetence to stand trial. The

---

1. AS 11.15.160 states:

 *Assault with intent to kill or commit rape or robbery.* A person who assaults another with intent to kill, or to commit rape or robbery upon the person assaulted, is punishable by imprisonment in the penitentiary for not more than 15 years nor less than one year.

2. AS 11.15.150 states:

 *Shooting, stabbing or cutting with intent to kill, wound or maim.* A person who maliciously shoots, stabs, cuts, or shoots at another person with intent to kill, wound, or maim him is punishable by imprisonment in the penitentiary for not more than 20 years nor less than one year.

trial court ruled against him on both grounds and sentenced him to fifteen years imprisonment under AS 11.15.150.

In this appeal, McKinney challenges the trial court's findings of sanity and competence. He raises issues concerning the interrelationship between voluntary intoxication and the insanity defense and the appropriate standard of review. Additionally, McKinney claims that due to inadequate time for his attorney to prepare for sentencing, he was denied due process and effective assistance of counsel.[3]

We find that the record in this case is sufficient to support both the finding of sanity at the time the offense was committed and the finding that McKinney was not incompetent by reason of insanity to stand trial and assist in his own defense. The insanity issue in this case is similar to that presented in the recently-decided case of *Alto v. State*, 565 P.2d 492 (Alaska, 1977). In *Alto*, we reversed a trial court's judgment of conviction because after evidence of insanity had been introduced, the state had failed to sustain its burden of proving sanity beyond a reasonable doubt. Here, however, we hold that there was an adequate basis for the trial court's judgment of conviction. Further, we hold that, as a matter of law, the insanity defense is not available to a defendant who is legally sane before voluntarily commencing drinking but loses control when intoxicated. Finally, we conclude that under the circumstances of this case, defendant was not denied due process at sentencing.

## I. FACTS OF THE CASE [4]

The attack occurred in the evening at the apartment of Curtis Harden. Present at that time were the defendant, Paul Hill (the victim and a security guard in Juneau), Marissa Osborne, Charlene Sumdum, Curtis Harden and Paul Hill's young child. McKinney had just been released from jail that morning, having served approximately three months on an earlier assault and battery charge and arrived at the apartment with Ms. Osborne.

Throughout the afternoon and evening, all those in Harden's apartment had been drinking. Although Harden stated that McKinney was not drunk, according to Sumdum, defendant had been drinking beer and liquor during the evening and was "drunk", "feeling pretty high." Ms. Osborne testified that she and McKinney had at least a few drinks before going to Harden's apartment, and Hill (the victim) stated that defendant had passed out earlier in the day.

At some point during the evening, all members of the group except McKinney left the apartment to buy liquor. The attack took place about forty-five minutes after they returned. No one in the group recalled seeing defendant obtain the knife used in the attack, but McKinney testified that he had obtained it without being noticed while the others were in the apartment. McKinney estimated that this occurred approximately twenty minutes before the attack. He further stated that he had the intention of stabbing Hill when he picked up the knife.

McKinney did not explain why he assaulted Hill. Of those in the apartment, only Harden was willing to suggest the reasons for the attack. He speculated that jealousy and hatred of "cops" motivated defendant to act as he did.[5]

---

**3.** A sentence appeal was later withdrawn.

**4.** The parties stipulated that on March 23 in Juneau, McKinney twice stabbed Paul Hill without justification or provocation, using a butcher knife taken from the kitchen of the apartment where the stabbing took plàce. The case was tried before Judge Carlson on the basis of this stipulation, the testimony introduced before the grand jury and at the preliminary hearing and the psychiatric reports.

**5.** Harden stated:
> I can only assume that he did what he did because of a fight, . . . that he felt that Paul was trying to take Marissa and keep her away from him, and the fact that again . . . he might have something against the uniform Paul was wearing, because he hates cops.

However, he indicated that Hill was not wearing his uniform at the time and further stated:
> . . . this was the only thing that I could assume that would give him the reason to

Shortly before the attack, Ms. Osborne had been sitting in the kitchen with Hill (the victim), her legs across his lap. McKinney called Ms. Osborne over to him a couple of times. She responded that she could hear him from where she was sitting, but she refrained from getting up and going over to him.

Before he had gone to jail, McKinney had been involved with Ms. Osborne. The nature of their relationship at the time of the assault, however, was unclear. Ms. Osborne stated that on the night of March 23, Harden and Hill (the victim) had been joking with McKinney about the fact that Ms. Osborne was McKinney's fiancee, but Ms. Osborne indicated that she did not think this was the nature of their relationship. McKinney's responses to the examining psychiatrists suggested that he did have some attachment to Ms. Osborne. He stated at trial he did not know whether or not he would have stabbed Hill if Ms. Osborne had come over to him when he called her.

Before going to the liquor store, Harden and Hill had a conversation with McKinney in the bathroom according to Ms. Osborne. At the preliminary hearing, Harden admitted that he and McKinney had been discussing a robbery or burglary. Ms. Osborne testified that McKinney told her "It's not worth going back to jail for" immediately after the bathroom conversation had occurred.

After the stabbing, Harden attempted to call a doctor for Hill (the victim), but was prevented by McKinney who told him, "No, you back off and not call and let that son of a bitch die."

McKinney was indicted on May 1, 1975. On May 8, the defendant filed a notice of intention to rely on an insanity defense. He was examined in Anchorage over a three-week period from July 1 to July 22 by Dr. Joseph Bloom. A concurrent psycholog-

ical evaluation was prepared by Allen Parker, Ph.D.

Trial, limited solely to the issue of defendant's sanity, commenced on October 27, 1975. Counsel immediately moved for a second psychiatric examination to resolve some of the conflicts between the reports of Dr. Bloom and Dr. Parker. At the outset, defense counsel indicated no difficulty communicating with his client and expressed no doubts as to his competency. The trial court questioned McKinney and found him capable of understanding what was happening and competent to give up his rights. At the very end of the hearing, McKinney was also · questioned by defense counsel. At least to counsel, McKinney's answers at that time appeared nonresponsive and contrary to information provided at the preliminary hearing.

Dr. J. Edward Olivier examined McKinney on November 1, 1975 in Juneau and indicated that he was unable to appreciate the charges against him and to cooperate with counsel.

On November 3, defendant moved for judicial determination of mental competency. Hearing was set for November 28.

With the exception of his trip to Anchorage, McKinney had been institutionalized at the state correctional center in Juneau. For two months before his trip to Anchorage for psychiatric evaluation and from his return until October 29, 1975, he had been held by himself in a "quiet cell," a cell with a single window at eye level, covered by a single steel flap which opened only from the outside. The flap was occasionally open for McKinney, but when it was, he could see only a wall.[6] On October 29, McKinney was moved to an "open face cell" in the booking area of the institution for observation because he appeared to be hallucinating and was not eating. This cell was reserved for

want to stab him. Those two reasons. 'Course it didn't really make sense to me but that's all I could come up with. (emphasis added)

**6.** In both this case and another pending before us, defendants incarcerated under such conditions evidenced marked deterioration. We question such methods of imprisonment. The federal and state constitutional issues of cruel and unusual punishment have never been raised in connection with Alaska's prisons before, and since not raised here, we do not reach them at this time.

those for whom the institution had a deep concern and was constantly monitored. On approximately November 10, defendant was confined in the maximum security area where he was allowed an hour of recreation and was able to communicate with inmates in adjoining cells.

Shortly before November 28, the trial court indicated that it was going to rule against defendant on the insanity defense. On November 28, it provided counsel with a memorandum of decision and a pre-sentence report dated November 25. Defendant had been unaware that sentencing would take place on November 28.

At the November 28 hearing, defense counsel informed the court that he was able to communicate with McKinney who appeared "much more rational today than when Dr. Olivier and I visited him on the first of the month." At this point, defense counsel advised the court that McKinney did not wish to proceed with the motion for determination of competency. Defense counsel was, however, prepared to submit the competency issue on the basis of Dr. Olivier's report alone.

To determine competency, on November 28, the court heard the testimony of Ramona Green, a psychologist with the Mental Health Clinic who had interviewed McKinney twice during the early part of November and found him to be in contact with reality and in progressively better spirits. At the hearing, the court independently questioned McKinney whose answers were brief, but logical and responsive. McKinney indicated that he was able to communicate with counsel and that regarding the sentencing, he "just want[ed] to get it over with."

The trial court found that, on October 27, McKinney was competent. McKinney was then found sane at the time of his actions and guilty on both counts. The court sentenced him to fifteen years on the charge of Stabbing with Intent to Kill, Wound or Maim. Pursuant to McKinney's instructions, defense counsel made no formal objections to sentencing. He did, however, allege one factual conflict between information in the pre-sentence report and testimony given by the defendant which concerned McKinney's ability to remember the events. He also indicated for the record that he would have objected to the determination of guilt, the determination of competency and to sentencing if his client had permitted.

## II. COMPETENCE TO STAND TRIAL

■ AS 12.45.100(a) prohibits the trial, conviction and sentencing of a defendant who cannot assist in his own defense or understand the proceedings against him.[7] This statutory mandate is of constitutional dimensions. The conviction of an accused who is not mentally competent to stand trial violates due process of law.[8] The accuracy of the factfinding process, the philosophy of punishment and the appearance of fairness in the adversary system are severely compromised by the conviction and sentencing of a defendant who is unable to consult with his attorney and rationally understand the charges against him. *See* Note, "Incompetence to Stand Trial," 81 Harv.L.Rev. 454, 457–59 (1967).

■ Not every mental illness, however, necessarily disables a defendant from functioning adequately in a criminal proceeding. In *Schade v. State,* 512 P.2d 907, 914 (Alaska 1973), we stated:

. . . [n]umerous persons are subject to criminal prosecution, and properly so, though they are of relatively low intelligence or suffering from some significant emotional or physical impairment. . .

---

7. The statute states in part:

No person who as a result of mental disease or defects lacks capacity to understand the proceedings against him or to assist in his own defense may be tried, convicted or sentenced for the commission of an offense so long as the incapacity endures.

8. *Schade v. State,* 512 P.2d 907 (Alaska 1973); *Kostic v. Smedley,* 522 P.2d 535, 537–38 (Alaska 1974); *Fajeriak v. State,* 520 P.2d 795, 801 (Alaska 1974); *Pate v. Robinson,* 383 U.S. 375, 378, 86 S.Ct. 836, 15 L.Ed.2d 815, 818 (1966).

The presence of some degree of mental illness is not an invariable barrier to prosecution. There may be an impaired functioning of some aspects of the defendant's personality and yet he may still be minimally able to aid in his defense and to understand the nature of the proceedings against him. (citations omitted)

The determination is a relative one, and each case must be determined on its own facts. 512 P.2d at 914. This factual determination is delegated to the trial court which must weigh the credibility of all the evidence and witnesses before it. If the trial court applies the correct standards of law, our appellate role in reviewing its determination is limited. Viewing the evidence in the light most favorable to the state,[9] we will examine whether or not there was substantial evidence in the record to uphold the ruling below. If there is substantial evidence, we will not substitute our opinion for that of the trial court.

In this case, McKinney challenges the trial court's finding of competency based on three grounds. First, he claims that the trial court should have given greater weight to defense counsel's assessment of competence under our decision in *Fajeriak v. State,* 520 P.2d 795, 802–03 (Alaska 1974). Second, he argues that Dr. Olivier's report [10] analyzing his behavior in jail along with testimony from October 27 [11] reflect-

---

**9.** We have stated many times that:

the evidence and inferences to be drawn from the evidence must be viewed in a light most favorable to the state.

*Alto v. State,* 565 P.2d 492 at 498 (Alaska 1977); *Dolchok v. State,* 519 P.2d 457, 460 (Alaska 1974); *Johnson v. State,* 511 P.2d 118, 125 (Alaska 1973); *Beck v. State,* 408 P.2d 996, 997 (Alaska 1965).

**10.** Based on his observations and the reports of the prior examinations, Dr. Olivier noted a marked deterioration in McKinney's mental condition since the October 27 hearing and found that defendant had "decompensated into a clearly psychotic state." Although finding no compelling objective proof of brain damage, Dr. Olivier stated, "It is my best guess that Dr. Parker's psychological findings [that McKinney suffered from brain damage and manifested responses which approached being psychotic in nature] are probably the most dependable, . . ." Additionally, he noted instances of violent behavior which were not alcohol related. Finally, he concluded:

McKinney is clearly psychotic and unable to fully appreciate the full import of the charges against him and he is unable to cooperate with his attorney . . . . . I am unable to give a firm opinion as to his mental state at the time of the stabbing last March. I *suspect* that he had a diminished capacity due to the combined effects of an unknown quantity of alcohol plus organic brain damage.

**11.** The dialogue was as follows:

MR. CARPENETI: Billy, I would like to ask you some questions about the event that took place in Curtis Harden's apartment in March of this year when you stabbed Paul Hill. Do you recall that occasion?
MR. McKINNEY: No I don't.
MR. CARPENETI: Do you have any recollection as to that occasion at all?
MR. McKINNEY: Unhnn.
MR. CARPENETI: Do you have any recollection as to a conversation which I had with you out at the jail, out at the Lemon Creek jail, after the preliminary hearing when we talked about some of the things that the witnesses had said?
MR. McKINNEY: No I don't.
MR. CARPENETI: Do you recall the testimony at the preliminary hearing when Curtis Harden . . . do you remember Curtis Harden?
MR. McKINNEY: Yes.
MR. CARPENETI: Do you know who it is I am talking about?
MR. McKINNEY: No.
MR. CARPENETI: Do you recall when he testified at the preliminary hearing?
MR. McKINNEY: No, I don't.
MR. CARPENETI: I take that back . . . I don't think Curtis Harden was around at the time. Do you recall when Charlene Sumdum testified at the preliminary hearing?
MR. McKINNEY: No I don't.
MR. CARPENETI: Do you recall Charlene Sumdum stating that you came from the couch and stabbed Paul Hill directly?
MR. McKINNEY: In the daytime?
MR. CARPENETI: Do you just remember her saying that?
MR. McKINNEY: Saying what?
MR. CARPENETI: Saying that you got up from the couch and came over and stabbed Paul Hill without going into the kitchen to get a knife.
MR. McKINNEY: Yeah, I remember her saying that.
MR. CARPENETI: Okay. Was that correct?
MR. McKINNEY: Yeah, that's correct.
MR. CARPENETI: Was there any . . . was it correct in all particulars Billy, that you had the knife with you on the couch before you went over to stab Paul Hill:

ing memory loss and inability to understand the proceedings mandates a finding of incompetence. Finally, McKinney contends that his attitude toward sentencing reflected an inability to adequately communicate with counsel.[12]

We turn first to McKinney's contentions regarding his attorney's estimation of his competence. We have previously stated that defense counsel's assessment of competence should be accorded substantial weight. *Fajeriak v. State*, 520 P.2d 795, 802–03 (Alaska 1974). In *Fajeriak*, we noted that defense counsel is in a better position than either the district attorney or the court to make this judgment. In *Fajeriak*, the defense counsel indicated that his client was competent. Obviously, the same weight need not be given to a defense counsel's assertions of incompetence. An attorney's duty as an advocate will often require him to present those arguments on behalf of his client, and while his opinion is still relevant, it is not determinative. We did not suggest in *Fajeriak* that the opinion of the defense counsel is the only relevant consideration.

We next consider McKinney's claims regarding the Olivier report and his testimony of October 27. The Olivier report does support McKinney's claim. However, we must weigh its conclusions against all the evidence to determine if there is substantial evidence supporting the ruling below. The trial court based its finding that McKinney was competent on the testimony of Ms. Green as well as its own questioning and observation of the defendant.

Ms. Green did not specifically testify that McKinney was competent to stand trial. Instead, she provided a logical explanation of defendant's behavior on October 27 and between October 27 and November 28. She offered a chronological framework in which to assess Dr. Olivier's finding of incompetence, the reports of defendant's hallucinations, his lack of appetite and his testimony at the end of the October 27 hearing.[13]

Ms. Green had spoken with McKinney twice in November. She indicated that she had been able to communicate with defendant on both occasions and that his spirits had improved on November 13 because he had been brought out of solitary confinement. Having spoken with McKinney briefly before the hearing, she found him on November 28 to be cognizant of his surroundings and in a state of mental well being. Ms. Green speculated that any deterioration in his mental state after October 27 was the combined result of the trauma of his court appearance and his isolation in jail.

> MR. McKINNEY: True.
> MR. CARPENETI: Are you sure of that?
> MR. McKINNEY: Yeah.
> MR. CARPENETI: Do you have any recollection of telling me after the hearing that it wasn't true. That in fact you'd gone over to the counter, the kitchen counter and picked up the knife and then had stabbed him but none of the others had seen that?
> MR. McKINNEY: Yeah, that's true.

**12.** McKinney here relies on language from *Schade v. State, supra* at 914, where this court stated that a defendant must be able to:
> understand the nature of the proceedings sufficiently to participate in certain decisions about the conduct of the defense. *Some strategic decisions must be the result of meaningful communication between defendant and his counsel.* (emphasis added)

**13.** Responding to Dr. Olivier's report, she stated:
> I'm not disputing that diagnosis, a catatonic reaction can have a very rapid onset and it can be precipitated by a severe emotional

> kind of trauma which I do believe Mr. McKinney suffered in his previous court appearance. . . .
> I had the impression that when he appeared in court previously he essentially testified against himself and he realized that this was happening while he was doing it. It was kind of an appalling realization. My impression of the chronology is if that occurred and it occurred after, I think, about four months in isolation in a state of what I would consider for Mr. McKinney to be one of quite serious stimulus deprivation without sufficient contact with other people, and not much to look at and not much to occupy his mind. So when he goes to court and he felt that he was testifying against himself and he was returned to the jail and this whole thing just preyed on his mind. I find it conceivable that he could have been then vulnerable to a confused dream-like state at times.

Resolving all inferences in the light most favorable to the state,[14] the picture that emerges is one of a man who temporarily lapsed into a psychotic and confused state, but whose mental condition thereafter improved. According to Ms. Green's analysis, McKinney's confusion at the close of the October 27 hearing could be attributable to the fact that he realized he had essentially testified against himself. The arguable confusion in answering his own counsel's questions might also be the result of a person of limited intelligence endeavoring to answer rather complicated, convoluted questioning.[15]

Dr. Olivier's report might equally reflect a temporary disturbance which was occasioned by McKinney's awareness that he had just testified against himself. In any event, McKinney had returned to a state of "well being" at least by November 28. Even assuming that Dr. Olivier's report accurately reflects McKinney's competence on November 1, a temporary lapse of incompetence after the hearing, while relevant to consider, would not be conclusive of McKinney's competence on October 27.

A temporary psychosis, though serious, may not necessarily preclude competency, even where it involves loss of memory. In *Fajeriak v. State, supra* at 801, we considered whether episodes of vertigo or momentary unconsciousness during trial were sufficient to render a defendant mentally incompetent. Although acknowledging that partial amnesia would undeniably have impaired appellant's ability to assist in his defense, we concluded that amnesia, whether partial or total, was not an adequate ground for a finding of incompetency. Here, McKinney was able to recall the events surrounding the crime at a time which gave counsel opportunity to prepare for trial. There is no allegation or indication of memory loss or inconsistency other than the arguably ambiguous inferences to be derived from McKinney's responses at the close of the October 27 hearing.

Considering all of the evidence presented below, we conclude that there is substantial evidence supporting the ruling that McKinney was competent. If we were the triers of fact, we might not have come to the same conclusion, and we note that there is substantial evidence in this case which would also support a finding of incompetency. Under these circumstances, we will not substitute our judgment for that of the trial court.

Finally, we must reject McKinney's third argument that his attitude at sentencing mandates a finding of incompetency.

McKinney's short, terse answers to questions posed by the trial court at sentencing were responsive and logical. They do, however, like McKinney's instructions to counsel, reflect a desire to conclude the proceedings as quickly as possible, without regard to the possible merit of any objections or motions which might be raised. Particularly in light of Ms. Green's analysis, however, this attitude toward sentencing and McKinney's unwillingness to follow the advice of counsel do not unequivocally exemplify an inability to understand the seriousness of the proceedings or to communicate with his attorney. Considering all the evidence, the trial court could have found McKinney's response to be an honest recognition that, regardless of the success of any motions, he would be institutionalized for some time. The judge could have concluded that, after a month's consideration, at a time when his spirits were improving, McKinney simply decided to dispense with any delay. Although McKinney's decisions may reflect an unwise choice not to aid in his defense, the fact that McKinney chooses not to assist in his defense does not mean he is incapable of doing so. As one of the examining psychiatrists in *Schade* made clear, such a conclusion is not psychologically sound,[16] and we cannot conclude that it is legally mandated.

---

14. *See* Note 9, *supra.*
15. *See* Note 11, *supra.*
16. Dr. Rader's report, which was part of the record in *Schade,* concluded:

. . . it is this examiner's opinion that [Schade] does have the ability to aid in his defense. Whether or not he will choose to do so is a different matter. Whether in any case

## III. SANITY

Under Alaska's insanity defense statute, AS 12.45.083,[17] once evidence of insanity is introduced, the state is required to prove sanity beyond a reasonable doubt.[18] In this case, the state has conceded that psychiatric reports from Dr. Bloom and Dr. Parker were sufficient to raise the issue. McKinney contends that the state has failed to meet its burden, arguing that there is insufficient evidence to support the trial court's finding of sanity.

■ Ordinarily, our standard for review of findings by a trial judge is the substantial evidence test. The finding below must be affirmed if it is supported by "such relevant evidence which is adequate to support a conclusion by a reasonable mind that there was no reasonable doubt as to appellant's guilt." All inferences are to be resolved in the light most favorable to the state.[19] Specifically, in *Dolchok v. State, supra,* we applied the substantial evidence test to review of determinations of sanity.

■ McKinney argues that the substantial evidence test is not entirely applicable to the insanity question in this case and urges us to assess the documentary evidence in the record independently. We disagree with this contention. McKinney did testify in this case, and evaluation of his demeanor and responses may have been significant to the trial court's conclusions. Thus, the primary reason for giving deference to the trial court's findings applies here.

■ Although the evidence in this case is equivocal, we hold that there was substantial evidence to support the trial court's finding of sanity.[20] The trial court found

in which a person who is known to be psychotic will choose to cooperate in his defense cannot be predicted with certainty. . . . [T]he most that can be established is whether or not he has the ability to do so. *Schade v. State,* 512 P.2d at 913.

17. AS 12.45.083 provides:

*Mental disease or defect excluding responsibility.* (a) A person is not responsible for criminal conduct if at the time of the conduct, as a result of mental disease or defect, he lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law.

(b) Reliance on mental disease or defect as excluding responsibility is an affirmative defense. The burden of proof beyond a reasonable doubt does not require the prosecution to disprove an affirmative defense unless and until there is evidence supporting the defense. The requirement of evidence supporting the affirmative defense is not satisfied solely by evidence of an abnormality which is manifested only by repeated criminal or otherwise antisocial conduct.

(c) If the defendant is acquitted on the ground of mental disease or defect excluding responsibility, the verdict and the judgment shall so state.

(d) When a person offers a defense based on mental disease or defect excluding responsibility for his criminal conduct, he may waive a jury trial without the consent of the state.

18. *See Alto v. State, supra; Dolchok v. State, supra; Johnson v. State,* 511 P.2d 118, 126–27 (Alaska 1973).

19. *Alto v. State, supra; Johnson v. State, supra; Hughes v. State,* 513 P.2d 1115, 1117 (Alaska 1973); *Beck v. State, supra.*

20. We note that no single factor relied on by the trial court is inconsistent with a finding of insanity. *See, e. g., United States v. Cooper,* 465 F.2d 451 (9th Cir. 1973), where the court reversed a robbery conviction and dismissed an indictment on the ground that the government had failed to prove defendant sane beyond a reasonable doubt. It stated:

The affirmative evidence is limited to this: Cooper could go through the motions to rob a bank, he could run, he appeared alert, his speech was intelligible, and he was relaxed and friendly. Grossly psychotic patients can perform all of these acts and maintain all of these appearances. Although this testimony may constitute some evidence bearing on sanity, it cannot be escalated to proof beyond a reasonable doubt that Cooper was sane. 465 F.2d at 455.

*See also People v. Kelly,* 10 Cal.3d 565, 111 Cal.Rptr. 171, 516 P.2d 875 (1973) (perpetrator of multiple stabbings found insane). We must view the evidence as a whole. *See Oxenberg v. State,* 362 P.2d 893, 897 (Alaska 1961), where we noted, within the context of determining if "corroboration" existed, that although each item of evidence considered individually was consistent with Oxenberg's innocence, review of the evidence together indicated "a rational tendency to associate Oxenberg with the commission of the offense."

McKinney guilty, in part, on the grounds that McKinney stabbed Mr. Hill twice, that McKinney went to the kitchen in the apartment, picked up the knife which he used to stab Mr. Hill and waited for some period of time before seizing the opportunity to stab Mr. Hill and that Mr. McKinney felt Mr. Hill should die because Mr. Hill had received the attentions of a woman from whom Mr. McKinney wanted attention.

Our conclusion that there is substantial evidence is supported by the report of Dr. Bloom which indicates a plausible jealousy motive. Dr. Bloom concluded that the series of events leading to the stabbing involved McKinney's impression that Hill was somehow becoming involved with his "girlfriend." These events might have included the fact that Ms. Osborne was sitting with her legs on Hill's lap, that she failed to come to him when asked and that Harden and Hill had been joking about his relationship with her. At trial, McKinney testified that he did not know if he would have attacked Hill if Ms. Osborne had come over to him. Furthermore, since the evidence was conflicting, the trial court could have concluded that Mr. McKinney obtained the knife after Ms. Osborne failed to respond to his call. We find this evidence sufficient to support the conclusion that McKinney acted out of jealousy.

Particularly if viewed in connection with the undisputed facts that McKinney planned and calculated the attack and ultimately stabbed Hill twice, existence of motive suggests that McKinney acted with a certain degree of logical consistency. This inference supports a finding that McKinney was able to control his actions.[21]

There is additional evidence in the record which would permit a conclusion that McKinney had the capacity to appreciate the wrongfulness and consequences of criminal conduct. Shortly before the commission of this very offense, McKinney apparently discussed participating in a burglary, and concluded "it's not worth going to jail for."

 Further support for the trial court comes from Dr. Bloom's psychiatric report. As indicated above, the psychiatric evidence in this case is conflicting.[22] Dr. Parker's tests suggest that McKinney was insane and Dr. Olivier's conclusions were equivocal. Dr. Bloom, however, found McKinney sane at the time of the offense. Although the trial court did not explicitly refer to the Bloom report, Bloom's conclusion clearly provides additional support for the decision below.[23]

21. *Cf. Dolchok v. State,* 519 P.2d 457 (Alaska 1974) (logical consistency of defendant's actions and attempt to cover up crime sufficient evidence on which to base finding of sanity. The facts in *Dolchok* are more supportive of a finding of sanity than the instant case but *Dolchok* does provide support for the trial court's findings.

22. Based on a battery of psychological tests, Dr. Parker found ". . . the presence of organic brain damage in an unequivocal manner" and ". . . idiosyncratic responses which approach being psychotic in nature." Questioning the validity of certain personality inventory tests in McKinney's case, he suggested possible schizophrenic psychosis in a man of only borderline intelligence. While Parker suggested the possibility of diminished capacity, no specific opinions regarding defendant's competence to stand trial or his mental state at the time of the offense were expressed.
For Dr. Bloom, McKinney was "diagnostically quite puzzling." Dr. Bloom noted that defendant had a history of "severe character pathology of an explosive and schizoid nature" and

also pointed to McKinney's "alcohol proneness and violent acting out when he does drink." Defendant himself recognized that drinking led to many of his problems. Dr. Bloom stated:
One could make out a case for a diagnosis of simple Schizophrenia, however, my feeling is that the major deficits which get Mr. McKinney into severe difficulties are his impulsiveness and lack of any type of character defenses against his angry impulses. I would see his primary problem as a severe character disorder as described above.
Although apparently referring to Dr. Parker's finding of organic brain damage by testing, he indicated that "[t]here was no gross indication in the clinical interview of any organic brain pathology."

23. Dr. Bloom stated that his findings regarding sanity were based on his understanding that "the presence of alcohol is not proper for a finding of nonresponsibility." Pointing to this statement, McKinney argues that Bloom has stepped outside of the role of psychiatrist and into the role of jurist. Since it is not the

■ We also think that the court's personal observations of McKinney at trial as well as Ms. Green's conclusion that McKinney was in a state of mental well being when examined by her in November, provide some further support for a finding of sanity at the time of the offense. Of course, a defendant might be sane at one point in time while insane at another. While evidence that a defendant is sane at a time subsequent to an offense is not conclusive as to his condition at an earlier time, it is relevant.[24] We conclude that when inferences from the evidence are resolved in favor of the state, the evidence was adequate to support a conclusion by a reasonable mind that there was no reasonable doubt as to appellant's guilt. We might not have come to the same conclusion as the trial court were we sitting as finders of fact, and note that there is substantial evidence that would also support a finding of insanity. However, we will not substitute our judgment for that of the trial court. The court's finding of sanity is therefore affirmed.

## IV. VOLUNTARY INTOXICATION

The Alaska insanity defense statute, AS 12.45.083, is modelled on the American Law Institute's substantial capacity test.[25] The statute does not speak to the role of voluntary intoxication in assessing a defendant's capacities which is the subject of AS 11.70.-030 which provides:

*Intoxication as defense.* (a) An act committed by a person while in a state of voluntary intoxication is not less criminal because he was intoxicated. However, when the existence of a particular motive, purpose, or intent is a necessary element to constitute a particular species, or degree of crime, the jury may take into consideration the fact that the defendant was intoxicated at the time in determining the purpose, motive, or intent with which he committed the act.

(b) As used in this section, "intoxication" refers to intoxication from the use of a drug in violation of AS 17.10 or 17.12 as well as to intoxication from alcohol.

■ We have not previously had the opportunity to address the issue of voluntary intoxication in the context of the current insanity statute. We did discuss the interrelationship between intoxication and the insanity defense in *McIntyre v. State,* 379 P.2d 615, 616–17 (Alaska 1963), a case decided under a version of the *M'Naghten* standard for insanity.[26] In *McIntyre,* we adopted the majority view that draws a distinction between the mental effect of intoxication which is the result of a particular alcoholic bout and an alcoholic psychosis such as delirium tremens, resulting from long continued habits of excessive

responsibility of a psychiatrist to evaluate the law, McKinney contends that Bloom's findings should be disregarded.

We agree with McKinney that a legal determination should not be put in the hands of psychiatrists. *See Pope v. State,* 478 P.2d 801, 810–11 (Alaska 1970) (Connor, J., dissenting). Nevertheless, we do not find that in this instance Dr. Bloom has usurped the judicial function. Dr. Bloom's statement of his understanding of the insanity test simply indicates the focus of his psychiatric inquiry and the parameters of his conclusions. It makes it clear that Dr. Bloom's conclusions regarding McKinney's mental state are based solely on an assessment of his capabilities when sober. In our opinion, Dr. Bloom's statement merely indicates that he did not consider the fact that voluntary intoxication may lessen McKinney's abilities to control his aggressive impulses as a basis of his finding of sanity. McKinney's arguments that intoxication should have been considered in connection with the insanity defense is discussed in the next section of our opinion.

24. *See* II Wigmore on Evidence § 233 at pp. 25–26 (3rd ed. 1940).

25. *See Schade v. State,* 512 P.2d 904, 911 (Alaska 1973), and Note 17, *infra.*

26. Under that standard, it must be clearly proved that, at the time of committing the act, the party accused was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing and of distinguishing between right and wrong in relation to the act with which he is charged. *Chase v. State,* 369 P.2d 997, 1002 (Alaska 1962).

drinking.[27] We concluded that "The former does not amount to legal insanity, whereas the latter may." 379 P.2d at 616. That position was considered to be in harmony with the legislative policy of AS 11.70.030. We held that voluntary intoxication is no defense to a crime except insofar as the jury may take it into account in determining purpose, motive or intent.[28]

■■■ This approach is consistent with more recent decisions from other jurisdictions which have attempted to distinguish between those who lose control solely as a result of a particular alcoholic bout and those for whom alcohol related or induced insanity is a pre-existing condition. Where the freedom of choice in taking the first drink is not at issue,[29] the language in *Evilsizer v. State*, 487 S.W.2d 113, 116 (Tex.Cr. App.1972), reflects the general rule that:

. . . if the pre-existing condition of mind of the accused is not such as would render him legally insane in and of itself, then the recent use of intoxicants causing stimulation or aggravation of the pre-existing condition to the point of insanity

cannot be relied upon as a defense to the commission of the crime itself.[30]

Where pathological intoxication is not at issue, the rule of the American Law Institute in Section 2.08 of the Model Penal Code is similar. Essentially, the Code provides that only intoxication which is not self-induced or which is pathological may be considered in determining sanity.[31]

We believe that a rule which renders the insanity defense unavailable to those who are legally sane and capable of controlling their drinking before becoming intoxicated is mandated by the purposes and philosophy behind our statutes. Society gains little from punishing a defendant who substantially lacks the capacity to control or appreciate the nature of his conduct. For such individuals, the goals of sentencing—rehabilitation and deterrence—have no meaning. On the other hand, where an individual has knowledge of the adverse effects of his drinking and can choose whether or not to drink, society can legitimately expect him to conform his conduct to its demands.

---

**27.** In *McIntyre, supra* at 616 n. 3, the court defines alcoholic psychosis as:

. . . grave mental disorder found in connection with excessive use of alcohol which was imbibed because of defective personality integration and unresolved conflicts.

**28.** In *Johnson v. State,* 511 P.2d 118, 124 (Alaska 1973), we explained:

The diminished capacity doctrine is based on the theory that while an accused may not have been suffering from a mental disease or defect at the time of his offense, sufficient to absolve him totally of criminal responsibility, the accused's mental capacity may have been diminished by intoxication, trauma, or mental disease to such an extent that he did not possess a specific mental state or intent essential to the particular offense. (footnote omitted)

The defense of diminished capacity was not raised in this case, and we do not consider this issue here.

**29.** *Cf. King v. United States,* 125 U.S.App.D.C. 318, 372 F.2d 383, 398 (1967).

**30.** *See also Parker v. State,* 7 Md.App. 167, 254 A.2d 381, 388 (1969); 8 A.L.R.3rd Voluntary Intoxication-Defense, Insanity Resulting from Intoxication 1265 § 6. *But cf. People v. Cahill,* 36 A.D.2d 746, 320 N.Y.S.2d 487 (1971).

**31.** The Code provides, in part:

Section 2.08. Intoxication.

(1) Except as provided in Subsection (4) of this Section, intoxication of the actor is not a defense unless it negatives an element of the offense.

. . .

(4) Intoxication which (a) is not self-induced or (b) is pathological is an affirmative defense if by reason of such intoxication the actor at the time of his conduct lacks substantial capacity either to appreciate its criminality [wrongfulness] or to conform his conduct to the requirements of the law.

(5) *Definitions.* In this Section unless a different meaning plainly is required:

. . .

(b) "self-induced intoxication" means intoxication caused by substances which the actor knowingly introduces into his body, the tendency of which to cause intoxication he knows or ought to know, unless he introduces them pursuant to medical advice or under such circumstances as would afford a defense to a charge of crime;

(c) "pathological intoxication" means intoxication grossly excessive in degree, given the amount of the intoxicant, to which the actor does not know he is susceptible.

**666**

No issue was raised contending that McKinney's intoxication was not voluntarily induced or indicating a pathological condition rendering him incapable of controlling his drinking before becoming intoxicated. Under these circumstances, Dr. Bloom's assumption that the presence of alcohol is not relevant to a finding of non-responsibility did not make the trial court's consideration of Dr. Bloom's report erroneous.

## V. DUE PROCESS AND EFFECTIVE ASSISTANCE OF COUNSEL

McKinney claims that his due process rights were violated because counsel was given inadequate time to prepare for sentencing. The pre-sentence report was not provided to defense counsel before the morning of November 28, and counsel lacked prior notice that sentencing would occur at that time. At sentencing, McKinney requested that no motions be made and that he wanted the hearing concluded as quickly as possible. Defense counsel followed these instructions and did not request a continuance. McKinney now argues that the court should have granted a continuance *sua sponte.*

Sentencing is a critical stage of the proceedings against a criminal defendant. *Egelak v. State,* 438 P.2d 712, 715 (Alaska 1968). A defendant, therefore, has the constitutional right to effective assistance of counsel,[32] and the concomitant right to a reasonable period of time in which to prepare.[33] While the responsibilities of counsel at sentencing are not easily defined, counsel should at least be prepared to present to the court all the factors and circumstances necessary for a reasonably meaningful hearing.[34] Obviously, counsel should have an opportunity to become familiar with all the reports serving as a foundation for the sentence in advance of the sentencing hearing.

In all cases where competency is at issue, we urge the trial courts to grant adequate time to prepare for sentencing, or a continuance *sua sponte* if it appears that counsel cannot fulfill these responsibilities without additional time. In such cases, the defense attorney may find himself in a dilemma: his obligation to his client requires that he follow instructions, while the ultimate interests of a defendant who may be found incompetent may require that he act contrary to those instructions. With adequate time, defense counsel can point out problems with the pre-sentence report and present dispositional alternatives which will foster the rehabilitation of a defendant.

Nevertheless, we do not find a violation of due process in this case. Had McKinney demonstrated any genuine prejudice resulting from the failure of the trial court to grant a continuance *sua sponte,* a remand for resentencing might be proper.[35] However, no such prejudice has been suggested to us either in McKinney's brief or in oral argument. Although defense counsel had read the pre-sentence report and was encouraged by the court to participate in the November 28 sentencing hearing, he noted only one relatively minor objection.[36]

32. *Egelak, supra* at 715.

33. *Doe v. State,* 487 P.2d 47, 56–57 (Alaska 1971); *Klockenbrink v. State,* 472 P.2d 958, 965 (Alaska 1970).

34. *United States v. Pinkney,* 551 F.2d 1241 (D.C.Cir., 1976). Although focusing on counsel's inadequacies rather than the failure of the trial court to grant a continuance, the *Pinkney* court articulated certain duties which are relevant here:

An attempt to verify the information contained therein would then enable counsel to supplement the reports when incomplete and challenge them when inaccurate. This duty is recognized by the American Bar Association . . . .

35. *Cf. United States v. Robin,* 545 F.2d 775 (2nd Cir., 1976) (due process and effective assistance of counsel denied where counsel receives presentence report on day of sentencing and makes objections, but request for adjournment and affirmative offers of proof denied).

36. In *Salazar v. State,* 559 P.2d 66, 71–72 (Alaska 1976), we noted that Alaska subscribes to the general rule that a trial court's refusal to grant a continuance will not be disturbed on appeal absent a demonstration of an abuse of discretion and emphasized that our prime focus

In summary, we find substantial evidence supporting the trial court's decision as to competence and sanity. We furthermore conclude that remand for resentencing is not required. The decision below is therefore

AFFIRMED.

on review is the reason for the requested continuance. In cases where the trial court denied a continuance which was sought to afford counsel adequate time to prepare, we have ordinarily required a showing of prejudice before finding an abuse of discretion and a due process violation. *Sullivan v. State,* 509 P.2d 832, 835 (Alaska 1973) (no abuse of discretion to deny continuance where thirteen days to prepare); *Klockenbrink v. State,* 472 P.2d 958, 965 (Alaska 1970) (denial of continuance an abuse of discretion where counsel given only five days to prepare for trial and important witness could not be located until after trial).

We did reverse without a specific showing of prejudice in *Doe v. State,* 487 P.2d 47, 57 (Alaska 1971). Prejudice was presumed from the fact that counsel was given only four days (this included a weekend) in which to prepare for trial. *Doe* is distinguishable from the present case, however. First, it involves preparation for trial rather than for sentencing. Although we recognize that sentencing may well be the most important part of the entire criminal proceeding, we note that the task of marshalling defenses and witnesses for trial may demand more time than is required to prepare for sentencing. *United States v. Pinkney, supra.* Also, the record in *Doe* showed that counsel had other cases to prepare during the four-day period.