Thomas P. HENSEL, Appellant,

v.

STATE of Alaska, Appellee.

No. 2432.

Supreme Court of Alaska.

Dec. 7, 1979.

Max F. Gruenberg, Jr., Anchorage, for appellant.

John A. Scukanec, Asst. Dist. Atty., Joseph D. Balfe, Dist. Atty., Anchorage, Avrum M. Gross, Atty. Gen., Juneau, for appellee.

Before RABINOWITZ, C. J., CONNOR, BOOCHEVER, and MATTHEWS, JJ., and DIMOND, Senior Justice.

## OPINION

BOOCHEVER, Justice.

Thomas P. Hensel appeals from his conviction of burglary, the denial of his motion for post-conviction relief, and the cumulative sentences imposed for burglary and malicious destruction of property. We shall first detail the facts giving rise to this case.

The usual tranquillity of the early morning hours in the area of Eagle River was destroyed on December 7, 1973 by a violent explosion. The explosion originated in a dynamite-filled storage bunker located on federal land and leased to E. I. du Pont de Nemours and Company. The blast, which resulted from the detonation of some 80,000 pounds of explosives, damaged dwellings and other buildings within a two-mile radius of the bunker.[1]

The explosion was not an accident. On two occasions during the two days prior to the explosion, various members of a group who were charged as co-defendants with Hensel[2] had broken into the storage bunkers and other buildings and had stolen a large quantity of explosives, plus incidentals such as blasting caps. The burglary was apparently motivated by the co-defendants' need for money.[3] The night of December 6, the co-defendants took the dynamite in two cars to a location in Wasilla where they planned to negotiate a sale.[4] The location, known as the "bus barn," was a two-story structure which served as a bus repair facility and as a residence for Thomas Hensel, appellant, and his family.[5] The co-defendants testified that they arrived about midnight. Dave Charon, alone, went upstairs and inside to speak with Hensel,[6] while the others waited outside by the cars, some of them smoking marijuana.[7]

According to the testimony of the co-defendants,[8] Charon remained upstairs with Hensel for fifteen to twenty minutes. The contents of any conversation between the two are not known. Hensel testified that there was never any discussion about purchasing the explosives. Charon, who was too "stoned" to remember much of the evening's events, was unable to recall any of the conversation with Hensel. Although the other co-defendants were not present, they assumed that Charon discussed with Hensel how they came to possess the dynamite and what might be done with it.[9]

Charon eventually returned to the cars with Hensel. The car trunks were opened, Hensel inspected the explosives, and stated that he could "handle it all."[10] One of the

---

1. Further background information regarding the incident is set forth in *Yukon Equipment, Inc. v. Fireman's Fund Ins. Co.*, 585 P.2d 1206 (Alaska 1978).

2. The group consisted of Jeff Cloud, Dave Charon, Guy Edmondson, and Scott Lace. They are referred to in this opinion as "defendants" or "co-defendants."

3. Dave Charon, one of the co-defendants, stated that monetary gain was not the motive for the burglary.

4. Dave Charon testified that the dynamite was taken to Hensel's residence in order to store it, not to sell it.

5. Hensel is married and has two children.

6. Dave Charon knew Hensel as an acquaintance prior to the meeting on December 6.

7. Marijuana was the least of the drugs consumed by the co-defendants. During the week prior to the night in question, the co-defendants had taken a variety of drugs, including LSD, MDA, cocaine, and dexedrine. All of the co-defendants were under the influence of some drug on December 6.

8. Hensel contends that the trial court erred in denying his motion for acquittal on the burglary charge. On appeal from a judgment of conviction entered pursuant to a jury verdict of guilty, we are bound to view the evidence in a light most favorable to the state. *Anthony v. State*, 521 P.2d 486, 492 (Alaska 1974).

9. Jeff Cloud testified that Hensel and Charon "seemed like they knew what was going on."

10. There is some discrepancy as to whether this statement applied to the explosives in general, or just the primer cord. Hensel denied making any statement.

co-defendants then stated that there was "more where that came from" and that it was stacked "9 cases high and 20 cases wide." Hensel testified that he asked where the explosives came from, but that the co-defendants gave him no response. After the co-defendants loaded the explosives into Hensel's Jeep, Charon asked Hensel if he had any fusing. Hensel stated that he had some out at his cabin. Apparently, these comments were the first overt indication to some of the defendants that they would blow up the bunkers they had burglarized.[11] Hensel then asked if he could come along.[12] The co-defendants said no, to which Hensel responded, "[w]ell, I can see . . . Eagle River from my balcony and I'll be watching."

Charon, Cloud, and Hensel drove out to Hensel's cabin and unloaded the dynamite, storing it in the attic. At this time, according to the co-defendants' testimony, the subject of "bunkers" was mentioned. Charon and Cloud said they needed six sticks for six bunkers. Hensel brought down seven sticks from the attic, the extra stick being reserved for purposes of a demonstration. The defendants stated that they wanted fifteen minute fuses. Hensel said, "[f]ine, I can give you enough where you have more than enough time; with time to spare." Hensel then capped and fused each stick, explaining how to place the charges in each of the bunkers so that the concussion of the one stick would explode the entire bunker. Accompanied by Cloud and Charon, Hensel took the seventh stick of dynamite to a nearby field, where he exploded it as a demonstration.

Cloud and Charon left Hensel and picked up the other co-defendants. On their way to the bunkers, they discovered that Hensel had fitted the charges with only six minute fuses.[13] They agreed that this would not allow them enough time to blow up all six bunkers, so they decided to blow up only one. The co-defendants returned to Eagle River by car, placed the stick of dynamite in one of the bunkers as Hensel had directed, lit it, and fled. Approximately three minutes after they had returned to the car and began driving away, the dynamite blew up in a fiery holocaust that registered 1.8 on the Richter Scale at the Earthquake Observation Center in Palmer, thirty miles away. The co-defendants barely escaped with their lives. At the time of the explosion, Hensel was asleep.

Hensel was indicted and charged with burglary not in a dwelling, malicious destruction of property, and receiving stolen property.[14] At the close of the prosecution's case, Hensel moved for judgments of acquittal on all charges based on insufficient corroboration of accomplice testimony. The superior court denied the motion. Hensel also argued that there was insufficient evidence of his having aided and abetted the burglary to hold him liable as an accomplice to the particular crime. It does not appear that the superior court ever ruled squarely on this issue. A jury convicted Hensel of all counts. After the guilty verdicts were returned, Judge Hanson ordered that the defendant undergo a psychiatric examination as part of the presentence investigation, stating:

> The—I'm very disturbed—this case disturbs me greatly, the acts of the defend-

11. One of the other co-defendants testified that while they were preparing to transport the dynamite to Hensel, they joked about blowing up the bunkers. The reason for blowing up the bunkers was to destroy the evidence of their burglary.

12. Hensel denied making such a statement. One of the co-defendants was not certain whether Dave Charon asked Hensel to come along, and the latter declined, or whether Hensel asked to go along, and was denied permission.

13. The explanation for Hensel's attaching "short" fuses was disputed at trial. Jeffrey Cloud testified that he thought Hensel was trying to kill them. Hensel explained that he attached shorter fuses than requested because he thought the co-defendants would explode the dynamite in an open field "for kicks."

14. The original indictment charged Hensel and all four co-defendants with these crimes. Pleas were negotiated with three of the co-defendants who agreed to testify against Hensel. A subsequent indictment charged only Hensel and Charon.

ant that the jury convicted [him] of seemed terribly incongruous with everything I can see about him and his family and it strikes me then that there must be some mental disability that I'm worried about.

Hensel's trial attorney thereafter moved for a new trial on the basis of newly discovered evidence which suggested that, at the time of his criminal conduct as a result of mental disease or defect, Hensel lacked the substantial capacity either to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of law.[15] The superior court denied the motion. The court sentenced Hensel to five years on the burglary count; three years, with two suspended, on the malicious destruction count to run consecutively to the burglary sentence; and three years, with two suspended, on the receiving and concealing count to run concurrently with the malicious destruction sentence. Hensel timely filed a notice of appeal.

Hensel retained new counsel who promptly filed a motion for post-conviction relief based on newly discovered evidence pursuant to Criminal Rule 35(b)(4). Relying on essentially the same psychiatric evidence presented in his motion for new trial, Hensel argued that he was suffering from a mental disease or defect which prevented him from having the state of mind which was required as an element of certain of the offenses of which he was convicted. In short, Hensel raised the issue of diminished capacity.

The superior court conducted an extensive evidentiary hearing on Hensel's application for post-conviction relief. Testimony concerning Hensel's background indicated that for some period of time prior to the Eagle River incident, Hensel had been depressed and concerned about his future. He had been burdened by misfortunes.[16]

Financial difficulties plagued the family. Hensel had trouble finding and keeping employment.[17] His wife went to work and provided the majority of the family income. Marital friction developed between Hensel and his wife, and communication between them broke down. Hensel began drinking. Things started to improve, however, when Hensel secured his job at the bus barn in October of 1973.

Extensive psychiatric testimony was also elicited at the post-conviction hearing. The evidence, which is critical to the issue of Hensel's alleged diminished capacity, is summarized later in this opinion.[18]

The superior court denied Hensel's motion for post-conviction relief.

Hensel appeals, raising three arguments. First, he contends that an improper allocation of burden of proof caused the superior court to judge improperly his evidence of diminished capacity and to deny erroneously his motion for post-conviction relief based on such evidence. Second, Hensel urges as error the superior court's denial of his motion for acquittal on the charge of burglary. Finally, Hensel argues that consecutive sentences for burglary and malicious destruction of property are unconstitutional under *Whitton v. State,* 479 P.2d 302 (Alaska 1970).

## I. DIMINISHED CAPACITY DEFENSE

### A. The Burden of Proof in Post-Conviction Relief Proceedings:

The superior court denied Hensel's application for post-conviction relief finding that he had failed to present sufficient facts to support his argument that he suffered from diminished capacity at the time he committed the offenses. The superior court's denial of relief turned, in part, upon a ruling which placed upon Hensel the burden of proving his allegations of diminished capaci-

---

**15.** Hensel relied on Criminal Rule 33 and AS 12.45.083(b) to support his motion for new trial.

**16.** For instance, Hensel, who was a mechanic, had his tools, which were apparently not insured, stolen.

**17.** Two companies which Hensel worked for went out of business.

**18.** *See* Part I(D) *infra.*

ty by a preponderance of the evidence. In arriving at this conclusion, the superior court: (1) rejected Hensel's contention that diminished capacity should be treated like insanity,[19] because it is a form of "partial insanity;" and (2) distinguished allocation of the burden of proof at trial from allocation of the burden in post-conviction relief proceedings.

 For purposes of this case, we accept, without deciding, the state's concession that a defense based on diminished capacity is sufficiently similar to a defense based on insanity that the allocation of the burden of proof established in AS 12.45.-083(b),[20] is the same in both cases. The terms of AS 12.45.083(b), however, are applicable at the defendant's *trial.* Hensel cites no authority[21] indicating that this en-

actment was intended to apply in proceedings for post-conviction relief.[22]

Hensel filed his motion for post-conviction relief pursuant to Criminal Rule 35(b)(4),[23] alleging that there existed newly discovered evidence[24] that he was incapable of harboring the mental element required for certain offenses of which he was convicted. Because the issue of diminished capacity arose in a post-conviction relief proceeding, the trial court held, relying on *Merrill v. State,* 457 P.2d 231 (Alaska 1969), that the petitioner had the burden of proving the facts to support his allegations by a preponderance of the evidence.

The question before us reduces itself to this: In a post-conviction relief proceeding where the defendant alleges that there ex-

19. AS 12.45.083(b) provides:
Reliance on mental disease or defect as excluding responsibility is an affirmative defense. The burden of proof beyond a reasonable doubt does not require the prosecution to disprove an affirmative defense unless and until there is evidence supporting the defense. The requirement of evidence supporting the affirmative defense is not satisfied solely by evidence of an abnormality which is manifested only by repeated criminal or otherwise antisocial conduct.

20. *See* note 20 *supra.* In *Johnson v. State,* 511 P.2d 118, 127 (Alaska 1973), we embraced the framework delineated in AS 12.45.083(b) as the judicial standard for allocating the burden of proof when insanity is placed in issue at trial.

21. All of the cases cited by Hensel for the proposition that the state must prove lack of diminished capacity beyond a reasonable doubt once the defendant has introduced some evidence of diminished capacity involved trial proceedings. *See McKinney v. State,* 566 P.2d 653 (Alaska 1977); *Alto v. State,* 565 P.2d 492 (Alaska 1977); *Dolchok v. State,* 519 P.2d 457 (Alaska 1974); *Johnson v. State,* 511 P.2d 118 (Alaska 1973); *Pope v. State,* 478 P.2d 801, 806–14 (Alaska 1970) (Connor, J., dissenting).

22. AS 12.45.083 is contained in the Code of Criminal Procedure. The provisions of the Code apply "to all criminal actions and proceedings in all courts." AS 12.85.010. A motion for post-conviction relief is not part of the original criminal case and is not necessarily criminal in nature. *State v. Hannagan,* 559 P.2d 1059, 1062 (Alaska 1977). In the past, we have characterized other motions for post-conviction relief as "independent *civil* proceeding[s]," *id.* at 1163 (emphasis added), which are

governed by the rules of civil procedure, *id.* at 1162. *Cf.* Criminal Rule 35(h). We believe that *Hannagan*'s characterization of Rule 35(b) motions as civil in nature should also apply to motions based on newly discovered evidence.

The context of AS 12.45.083 further supports the conclusion that subsection (b) is to apply only at trial. Subsections (c) and (d) of the statute plainly address themselves to matters arising in a criminal trial. Subsection (b) speaks of "affirmative defense" and the prosecution's burden of disproving such defense. This language makes sense in a trial proceeding, where the state is prosecuting the defendant, but makes little sense in a post-conviction relief proceeding, where the defendant is the petitioner and the state the respondent.

23. Criminal Rule 35(b) specifies:
*Post Conviction Procedure—Scope.* Any person who has been convicted of, or sentenced for, a crime and who claims:

(4) that there exists evidence of material facts, not previously presented and heard, that requires vacation of the conviction or sentence in the interest of justice;

may institute a proceeding under this rule to secure relief.

24. Whether the evidence was "newly discovered" was contested by the state at the post-conviction hearing. The trial court never directly ruled on that issue, although it may be inferred that the judge found the evidence to be "newly discovered." The parties do not raise this issue on appeal, and our disposition of the case makes it unnecessary for us to discuss it further.

ists newly discovered evidence that he suffered from diminished capacity sufficient to negate the mental element required to convict him of his crimes, what standard of proof is required, and upon whom does the burden rest, to convince the court that there are material facts that require the conviction be vacated in the interests of justice?

■ This precise issue is one of first impression in Alaska. Hensel argues that the allocation procedure applicable to an insanity defense at trial should also apply to post-conviction relief proceedings. Under our insanity defense decisions,[25] the burden to prove beyond a reasonable doubt that the defendant lacked diminished capacity would shift to the state once the defendant introduced "some" evidence of diminished capacity. The state argues, however, that in a post-conviction relief proceeding, the burden should rest upon the defendant to prove by a preponderance of the evidence the facts asserted.

While no Alaska case squarely decides this issue, language in *Merrill v. State*, 457 P.2d 231 (Alaska 1969),[26] supports the state's argument. Defendant Merrill, convicted of robbery, filed a petition for post-conviction relief under a predecessor version of Criminal Rule 35(b). Merrill alleged that his sentence violated the constitution because, *inter alia*, he was arrested without probable cause. We upheld the superior court's denial of Merrill's petition for post-conviction relief. In so doing, we rejected Merrill's argument that the *state* had failed to substantiate its theory of probable cause.

Noting that a motion for post-conviction relief is essentially a collateral attack upon the judgment, we held:

> To secure relief in a habeas corpus proceeding, now largely superseded by motions under Criminal Rule 35, the petitioner has the burden of alleging and proving by a preponderance of the evidence all the facts necessary to overturn the prior judgment of conviction.

*Id.* at 234 (footnote omitted). We have recently reaffirmed this principle. *Lewis v. State*, 565 P.2d 846, 853 & n.9 (Alaska 1977).[27]

*Merrill* dealt with a petition for post-conviction relief alleging violation of the defendant's constitutional rights. Such grounds for relief are currently specified in Criminal Rule 35(b)(1). Hensel argues that *Merrill* did not determine the standard of proof and allocation thereof in proceedings for post-conviction relief based on newly discovered evidence.[28] While we agree that *Merrill* is not dispositive of the issue here presented, we believe its reasoning applies equally to motions based on newly discovered evidence.

■ A defendant seeking to set aside a conviction based on newly discovered evidence levels a collateral attack on a final judgment. The defendant will normally have had a trial on the merits, and such proceedings must be presumed valid. *See Thompson v. State*, 197 Kan. 630, 419 P.2d 891, 895 (1966). The post-conviction relief proceeding is not another trial; it is separate from the original criminal proceeding,

---

**25.** *Alto v. State*, 565 P.2d 492, 497 (Alaska 1977); *Johnson v. State*, 511 P.2d 118, 126–27 (Alaska 1973); *Pope v. State*, 478 P.2d 801, 812–14 (Alaska 1970) (Connor, J., dissenting).

**26.** Certain dicta in *Merrill* not relevant to this opinion have been overruled by *Donnelly v. State*, 516 P.2d 396, 399 n.6 (Alaska 1973).

**27.** This principle is widely accepted in other jurisdictions. *See, e. g., People v. McClellan*, 183 Colo. 176, 515 P.2d 1127, 1128 (1973) (en banc); *Cooper v. State*, 96 Idaho 542, 531 P.2d 1187, 1190 (1975) (construing Uniform Post-Conviction Procedure Act); *People v. Stovall*, 47 Ill.2d 42, 264 N.E.2d 174, 176 (1970); *Parsons v. Brewer*, 202 N.W.2d 49, 52 (Iowa 1972);

*Thompson v. State*, 197 Kan. 630, 419 P.2d 891, 895 (1966); *Matter of Jones*, 578 P.2d 1150, 1151 (Mont.1978); *Young v. Cupp*, 8 Or.App. 41, 491 P.2d 1201, 1202 (1971) (post-conviction relief petitioner must prove allegations of petition by "preponderance" of the evidence); *cf. Doggett v. State*, 91 Nev. 768, 542 P.2d 1066, 1068 (1975) (per curiam) (post-conviction relief petitioner has burden of proving incompetency to stand trial by "clear and convincing evidence").

**28.** Such grounds for post-conviction relief are specified in Rule 35(b)(4), Alaska R.Crim.P. *See* note 25 *supra*.

and it is governed primarily by rules of civil procedure. *State v. Hannagan*, 559 P.2d 1059, 1062–63 (Alaska 1977); *Merrill v. State*, 457 P.2d 231, 234 (Alaska 1969); Alaska R.Crim.P. 35(h). To protect the integrity of the prior proceeding, the defendant should be required to prove by a preponderance of the evidence those facts which would entitle him to have the conviction set aside. We believe that this rule applies equally to motions based on newly discovered evidence as it does to motions based on alleged violation of constitutional rights.

■ Although we have discovered no case dealing directly with the allocation of the burden of proof in a post-conviction proceeding where the defendant's mental responsibility at the time of the crime is in issue,[29] we find support for our conclusions in other authorities of a more general nature. In terms almost identical to Criminal Rule 35(b)(4), the ABA Standards Relating to Post-Conviction Remedies provide that a conviction may be vacated in the interests of justice on the grounds that there exists newly discovered evidence of material facts.[30] The ABA standards specifically address the matter of burden of proof in a post-conviction hearing. Section 4.6(d) provides:

> The allocation between the applicant and respondent of the burden of proof on issues of fact is primarily a corollary of the underlying substantive law governing the claims advanced. *Ordinarily, the proponent of factual contentions, whether the applicant's proof of the elements of a prima facie case or the respondent's proof of affirmative defenses, should have the burden of establishing those facts by a preponderance of evidence.* [emphasis added]

In post-conviction relief proceedings, we believe that the general rule should govern. The defendant who wishes to attack his conviction on the basis of newly discovered evidence of diminished capacity should, as the proponent of such factual contention, bear the burden of proving facts justifying post-conviction relief by a preponderance of the evidence.[31]

More specifically, we hold that in a Rule 35(b) motion, the defendant has the burden of proving by a preponderance of the evidence that newly discovered evidence would be likely to change the result of the trial—that is, that the evidence would be sufficient to create a reasonable doubt as to his guilt. The trial court did not err in requiring Hensel to sustain that burden of proof.

**B. The Diminished Capacity Doctrine:**

■ Alaska recognizes the doctrine of diminished capacity.[32] We explained the concept of diminished capacity for the first time in *Johnson v. State*, 511 P.2d 118, 124 (Alaska 1973) (footnote omitted):

**29.** *Doggett v. State*, 91 Nev. 768, 542 P.2d 1066 (1975) (per curiam), cited by the state, is not on point. *Doggett* involved the issue of the defendant's mental competency to stand trial, not his mental responsibility at the time of the criminal conduct. *Id.*, 542 P.2d at 1068. With respect to the burden of proof, the analysis of the two issues may be quite different. At least one court has held that mental competency to stand trial need not be established beyond a reasonable doubt. *Young v. Smith*, 8 Wash. App. 276, 505 P.2d 824, 825 (1973).

**30.** ABA Standards Relating to Post-Conviction Remedies § 2.1(a)(v) (Approved Draft 1968).

**31.** The arguments advanced by Hensel in reliance on *Salinas v. State*, 373 P.2d 512 (Alaska 1962), are without merit. *Salinas* delineated the requirements for granting a new trial based on newly discovered evidence. Hensel argues that none of the requirements place the burden

on the defendant to produce a preponderance of the evidence. *Salinas*, however, does not discuss the burden of proof, although it quotes with approval the conclusion of the trial court that "the defendant has not made its showing," indicating that the burden was placed on the defendant. 373 P.2d at 514.

In post-conviction proceedings, it is the defendant who seeks relief and who has the burden of initially presenting evidence to support his allegations. It is a well settled rule that the burden to prove the case is on the party who seeks affirmative relief. *California Employment Commission v. Malm*, 59 Cal.App.2d 322, 138 P.2d 744, 745 (1943). *See State v. Alto*, 589 P.2d 402, 404 n.8 (Alaska 1978).

**32.** *See Mill v. State*, 585 P.2d 546, 550–51 (Alaska 1978).

The diminished capacity doctrine is based on the theory that while an accused may not have been suffering from a mental disease or defect at the time of his offense, sufficient to absolve him totally of criminal responsibility, the accused's mental capacity may have been diminished by intoxication, trauma, or mental disease to such an extent that he did not possess a specific mental state or intent essential to the particular offense.

Subsequent decisions have clarified the nature of the doctrine. In *Mill v. State*, 585 P.2d 546, 550 (Alaska 1978), we noted the "limited function" of the diminished capacity doctrine, "which acts only to negate a specific mental element or intent necessary to the charged offense." Thus, in *Mill*, we held that diminished capacity is not a defense to general intent crimes.[33] *Id.* at 551.

The doctrine of diminished capacity arises most often in, and finds its widest acceptance when applied to, homicide cases.[34] The inquiry in such cases is whether the defendant's mental capacity was so diminished that he was incapable of deliberating or premeditating the killing, the required mental element for certain forms of first degree murder,[35] or incapable of harboring malice aforethought, the re-quired mental element for either first or second degree murder.[36] The theory of diminished responsibility has not been limited entirely to homicide cases.[37] The rationale behind the doctrine is equally applicable to any crime requiring a specific intent as an essential element.[38]

C. Analysis of Hensel's Crimes:

Hensel was convicted of being an accessory before the fact to the crimes of burglary not in a dwelling and malicious destruction of property. He was also convicted of receiving and concealing stolen property. With respect to the burglary and malicious destruction charges, Hensel contends that his evidence of diminished capacity established that he was incapable of harboring the specific mental element required for conviction as an accomplice. With respect to the receiving and concealing charge, Hensel argues that because of a mental disease or defect, he did not receive the stolen property with the requisite mental element. Hensel maintains that since there are no lesser included offenses with respect to being an aider and abettor or receiving stolen property, diminished capacity provides a complete defense to each of the crimes of which he was convicted.[39]

---

**33.** *Accord, Kimoktoak v. State*, 584 P.2d 25, 33 (Alaska 1978); *People v. Nance*, 25 Cal.App.3d 925, 102 Cal.Rptr. 266, 269–70 (1972).

**34.** *See, e. g., People v. Wolff*, 61 Cal.2d 795, 40 Cal.Rptr. 271, 394 P.2d 959 (1964).

**35.** *See, e. g., People v. Goedecke*, 65 Cal.2d 850, 56 Cal.Rptr. 625, 423 P.2d 777 (1967); *see generally* W. LaFave & A. Scott, Criminal Law § 42 (1972).

**36.** *See, e. g., People v. Ford*, 65 Cal.2d 41, 52 Cal.Rptr. 228, 416 P.2d 132 (1966), *cert. denied*, 385 U.S. 1018, 87 S.Ct. 737, 17 L.Ed.2d 554 (1967); *People v. Conley*, 64 Cal.2d 310, 49 Cal.Rptr. 815, 411 P.2d 911 (1966); *see generally* W. LaFave & A. Scott, Criminal Law § 42 (1972).

**37.** *See, e. g., People v. Wetmore*, 22 Cal.3d 318, 149 Cal.Rptr. 265, 267, 583 P.2d 1308, 1310 (1978) (burglary with intent to commit theft); *Schwickrath v. People*, 159 Colo. 390, 411 P.2d 961 (1966) (felonious escape); *People v. Colavecchio*, 11 A.D.2d 161, 202 N.Y.S.2d 119 (1960) (common law larceny). *See generally* Annot., 22 A.L.R.3d 1228 (1968).

**38.** This principle would seem to be codified in AS 12.45.085, which states, in relevant part:

Evidence that the defendant suffered from a mental disease or defect is admissible whenever it is relevant to prove that the defendant did or did not have a state of mind which is an element of the offense.

*See Johnson v. State*, 511 P.2d 118, 123 n.8 (Alaska 1973). This provision is identical to the Model Penal Code's formulation of the diminished capacity doctrine. Model Penal Code § 4.02(1) (Proposed Official Draft 1962). *See* W. LaFave & A. Scott, Criminal Law § 42, at 331 n.50 (1972).

**39.** For reasons not made clear, Hensel partially undercuts this argument in his reply brief. There, he argues that the evidence of his diminished capacity should lead to an acquittal on the receiving and concealing charge, and to a reduction of the burglary conviction to unauthorized entry (AS 11.20.135). He also argues that the malicious destruction conviction should be reduced to "misdemeanor malicious destruction." Hensel cites no statute defining the latter crime. In any event, we need not

In order to determine whether Hensel's evidence of diminished capacity negated the mental elements required for these crimes, we must examine in some detail the mens rea requirements for accomplice liability and receiving and concealing stolen property.

1. Accomplice Liability:

The theory of accomplice liability rests on the premise that one party may commit a crime, yet guilt will attach to another.[40] In determining an accomplice's liability for the crime committed by another, the focus is not only upon the substantive offense committed by the perpetrator; it is also upon the accomplice's acts and mental state vis-à-vis the criminal enterprise in general. This, we believe, is made clear in our decisions discussing accomplice liability. We defined an accomplice for the first time early in the jurisprudence of this state. In *Mahle v. State,* 371 P.2d 21 (Alaska 1962), we stated:

> An accomplice is . . . one who in some manner, knowingly and with criminal intent aids, abets, assists or participates in a criminal act.

*Id.* at 25 (footnote omitted). Under *Mahle's* definition, an accomplice must in some way aid, abet, assist, or participate in the criminal enterprise.[41] This is the actus reus required for accomplice liability. In *Mahle,* we held that evidence of an individual's "assisting in forcing open the safe, extracting the contents therefrom and then dispos-

ing of the safe and its contents" satisfied the physical act requirement for accomplice liability to the crime of larceny. *Id.* at 25.

The mental element requirement is a little more complex. Under *Mahle,* the party must act "knowingly and with criminal intent." *Id.* at 25. This double-pronged mens rea element requires both knowledge and criminal intent. The knowledge element relates to an individual's knowledge of the criminal enterprise. In *Mahle,* this requirement was satisfied by the individual's knowledge that the safe and whatever it contained had been stolen. *Mahle's* requirement of "criminal intent" was not further explained. The opinion indicated, however, that the criminal intent element was general in nature, satisfied by evidence that the individual voluntarily committed the act constituting the actus reus of the crime.[42]

Although *Mahle's* definition of accomplice has been reaffirmed many times,[43] subsequent decisions have altered the precise nature of the mens rea requirement.[44] In *Tarnef v. State,* 512 P.2d 923 (Alaska 1973), we stated:

> It is well established at common law and in Alaska that a person cannot be convicted of "aiding and abetting" a crime unless it is shown that he had the *specific criminal intent to bring about the illegal end.*

*Id.* at 928 (emphasis added). The significance of this formulation of the mens rea

---

reach this issue given our disposition of the case.

**40.** R. Perkins, Criminal Law 648 (2d ed. 1969).

**41.** It is not necessary, as *Mahle's* language might imply, that the accomplice perform some element of the criminal act. It is sufficient for accomplice liability that the individual commit some act, not necessarily criminal and not necessarily an act which is a part of the actus reus of the substantive crime, which aids and abets the commission of the offense. In *Carman v. State,* 602 P.2d 1255 (Alaska 1979), we held that a jury could find a person an accomplice to robbery upon evidence that he purchased two ski masks with his own money knowing that they would later be used in a hold-up. *Id.* at 1261. Similarly, if the crime involved is burglary, we would have no trouble imposing accom-

plice liability on a person who, with the required mens rea, furnishes tools that will facilitate the breaking and entering.

**42.** *See* R. Perkins, Criminal Law 743–44 (2d ed. 1969).

**43.** *Middleton v. State,* 577 P.2d 1050, 1053 n. 9 (Alaska 1978); *Evans v. State,* 550 P.2d 830, 841 (Alaska 1976); *Gordon v. State,* 533 P.2d 25, 29 (Alaska 1975); *Beavers v. State,* 492 P.2d 88, 97 (Alaska 1971); *Flores v. State,* 443 P.2d 73, 78 (Alaska 1968); *Taylor v. State,* 391 P.2d 950 (Alaska 1964); *Daniels v. State,* 383 P.2d 323, 324 (Alaska 1963).

**44.** The actus reus for accomplice liability is explained in more detail in section II, *infra.*

requirement was not fully explicated in *Tarnef.* Nevertheless, this language, which was addressed to *Mahle's* general "criminal intent" seems to indicate that "knowledge," would not satisfy the mental aspect of accomplice liability. Rather, the individual must also have had the specific criminal intent to bring about the illegal end. Suppose, for example, a person furnished burglary tools to others knowing that they planned to burglarize some building. If the person gave the others the tools out of fear and with the intent to report the planned burglary to law enforcement authorities, then accomplice liability would not attach, for the individual would not have acted with the specific intent to help bring about the illegal end. This formulation of the mens rea requirement is supported by subsequent opinions,[45] and we believe that it is the generally accepted rule.[46] Thus, with respect to the mental element, we hold that liability for the crime of another will attach only upon a showing that an individual had knowledge of the criminal enterprise and specifically intended, by his conduct, to aid, abet, assist, or participate in the criminal enterprise.[47] Since accomplice liability depends upon the establishment of these specific elements, evidence of the defendant's diminished capacity is admissible to negate these elements.[48]

### 2. Receiving and Concealing Stolen Property:

Hensel was convicted of receiving and concealing stolen property based on his possession and storage of the stolen explosives. Hensel's liability on this charge was primary, rather than derivative.

At the time Hensel took possession of the explosives, AS 11.20.350 specified:

A person who buys, receives, or conceals money, goods, bank notes, or other thing[s] which may be the subject of larceny and which has been taken, embezzled, or stolen from another person, *knowing it to have been taken, embezzled, or stolen,* is punishable by a fine of not more than $1,000 and by imprisonment for not less than one year nor more than three years. [emphasis added]

The mens rea element of receiving and concealing stolen property has two facets. The first is specified in the statute itself: the person must receive or conceal the property "*knowing* it to have been . . . stolen." The second mens rea requirement, rarely specified in the statutes,[49] is that the person receive the property with the intent to deprive the owner thereof.[50] Either of these elements—knowledge or intent—may be negated by evidence of a mental disease or defect so substantial that the receiver

---

**45.** *See Evans v. State,* 550 P.2d 830, 841 (Alaska 1976), where we stated:

Complicity is established only if there is conduct voluntarily undertaken *for the purpose of participating or assisting in the completion of a crime.* [emphasis added]

**46.** *See* W. LaFave & A. Scott, Criminal Law § 64, at 506 (1972).

**47.** The superior court used this standard in the hearing on Hensel's motion for post-conviction relief. Discussing the passage from *Tarnef,* the court ruled:

This language supports the conclusions that *knowledge* and *specific criminal intent to bring about the illegal end* are the mental elements which the petitioner must disprove by a preponderance of the evidence. [emphasis in original]

The substance of this standard was also embodied in the court's instructions to the jury in the trial of this case.

**48.** We need not reach the issue of whether in some cases a less specific criminal intent would suffice—for example, whether a defendant who furnished a weapon to aid in a robbery could be found guilty if the weapon were used to murder rather than to rob the intended victim. We also need not decide whether a defendant who furnishes a weapon with the intent that it be used for criminal purposes, but without knowledge as to the particular crime to be perpetrated, could be found guilty as an accomplice.

**49.** Since the element of intent to deprive the owner of his property is not specified in the statute, the prosecution is not required to allege and affirmatively prove such element. Negating the intent, however, will disprove the crime. *See* R. Perkins, Criminal Law 330 (2d ed. 1969).

**50.** *See* W. LaFave & A. Scott, Criminal Law § 93, at 688 (1972); R. Perkins, Criminal Law 329–30 (2d ed. 1969).

was prevented from "knowing" the stolen character of the property or "intending" to deprive the owner thereof.[51]

D. Evidence of Diminished Capacity:

During the hearings on Hensel's motion for new trial and motion for post-conviction relief, several expert medical witnesses testified about Hensel's mental condition. Various reports prepared by these witnesses were also before the court. Finally, reports were submitted to the court by a clinical psychologist who did not testify at either hearing. All such evidence, of course, was important to the determination of whether Hensel suffered from diminished capacity at the time of the offense. Based on the testimony, the superior court concluded that Hensel failed to prove by a preponderance of the evidence sufficient to be likely to change the result of the trial "that he lacked the specific mental state of intent essential to the offenses for which he was convicted." [52]

When the superior court has applied correct standards of law in making its decision, our appellate role in reviewing its determination is limited.[53] The superior court, which sits as the trier of fact, has the opportunity to weigh the credibility of the evidence and witnesses before it, and it is entitled to resolve any conflicts and inconsistencies within the evidence.[54] Our task as an appellate tribunal is to determine if the superior court erred in its ultimate conclusion that the new evidence, if presented at a new trial, would probably not create a reasonable doubt as to Hensel's guilt. We have long recognized that the trial court has considerable discretion in making this finding, and we will not reverse it unless an abuse exists.[55]

---

51. *Cf.* W. LaFave & A. Scott, *Criminal Law* § 93, at 690, where the authors, in discussing defenses to the crime of receiving and concealing, state:

> Likewise, intoxication may be so severe as to negative the existence of the receiver's knowledge, though had he been sober he would have known the property to be stolen.

52. The mens rea requirements for the crimes committed by Hensel are discussed in Part I(C) *supra.*

53. *McKinney v. State,* 566 P.2d 653, 659 (Alaska 1977); *Parsons v. Brewer,* 202 N.W.2d 49, 52 (Iowa 1972).

54. *McKinney v. State,* 566 P.2d at 659; *Doggett v. Warden, Nevada State Prison,* 572 P.2d 207, 209 (Nev.1977).

55. We are reviewing a motion for post-conviction relief here, not strictly speaking a motion for new trial. But the state's burden on collateral attack should, if anything, be less than on direct attack (new trial motion) and thus a standard which makes the state do more under Rule 35 than it would have to do under Rule 33 is illogical. *See* 8A Moore's Federal Practice—Criminal Rules ¶ 33.02[3] (2d ed. revised 1978). In the typical case where a motion for new trial is made based on newly discovered evidence, the state does not present conflicting evidence, it merely argues that the evidence is either not sufficiently important or so incredible that, if presented at a second trial, it probably would not change the result. When the trial judge agrees with the state, appellate courts frequently do not interfere, even though no conflicting evidence has been presented by the state on the motion. In such cases, the abuse of discretion standard is the right one. The standard applied for motions for new trial under Federal Criminal Rule 33 is one of abuse of discretion. *United States v. DiCarlo,* 575 F.2d 952, 954 (1st Cir.), *cert. denied,* 439 U.S. 834, 99 S.Ct. 115, 58 L.Ed.2d 129 (1978). We have generally adhered to the same standard. *Amidon v. State,* 565 P.2d 1248, 1261 (Alaska 1977); *Dunbar v. State,* 522 P.2d 158, 160 (Alaska 1974), *aff'd after remand,* 555 P.2d 548 (1976); *Pederson v. State,* 420 P.2d 327, 333 (Alaska 1966); *West v. State,* 409 P.2d 847, 852 (Alaska 1966); *Rank v. State,* 382 P.2d 760, 761 (Alaska 1963); *Salinas v. State,* 373 P.2d 512, 515 (Alaska 1962). While we approve of this deferential standard of review, we will exercise it while keeping in mind that:

> Because of the requirement that a motion for a new trial be brought before the judge who tried the case, the effect is often to permit a judge to sit in judgment on his own conduct. There is surely great economy in having the person who knows most about the case determine the validity and probable effect of the alleged new evidence. But there is also the danger that the judge might become an advocate for the result. . . . Some judges have a human tendency to identify criticism of the trial's result with offense to self, to paraphrase the the the supreme court's statement in a criminal contempt case. *United States v. Offet [Offutt v. United States],* 348 U.S. 11 [75 S.Ct. 11], 95 [99] L.Ed. 11 (1954).

8A Moore's Federal Practice—Criminal Rules ¶ 33.03[1], p. 33–15 (2d ed. revised 1978).

The issue before the superior court was whether the newly discovered evidence established that Hensel suffered from a mental disease or defect which prevented him from having a particular mental element of the offenses of which he was convicted. With respect to whether Hensel suffered from a mental disease or defect, the testimony of the expert witnesses was in substantial conflict. Dr. Johnstone, a psychiatrist, concluded that Hensel suffered from no current psychological defect and found no evidence of his having suffered from such defects in the past.[56] Dr. Wetherhorn, a clinical psychologist, found that Hensel suffered no psychological defect and no impairment of his abstract reasoning ability. Although Hensel was found by Dr. Wetherhorn to be "remarkably anxious," he did not find evidence of schizophrenia. He classified Hensel's problems as "essentially legal and economic." To be sure, these conclusions were inconsistent with those of psychiatrist Dr. Roberts, who stated that Hensel suffered from schizophrenia. Dr. Ohlson's conclusions fell somewhere between these two extremes. He found that Hensel's mental state might be in the beginning stages of a psychotic process, but concluded that gross psychotic thinking disturbance was not present. The conflict, of course, was for the superior court to resolve. The expert testimony is fairly evenly balanced. Evidence was introduced both to support and refute the contention that Hensel suffered from a mental disease or defect.

With respect to whether any established defect prevented Hensel from forming the mental element of the offenses of which he was convicted, the evidence was again in conflict. Dr. Roberts was of the opinion that, as a result of his mental impairment, Hensel would not have been able maturely and meaningfully to reflect upon the broader consequences of his actions on the night in question.[57] He conceded, however, that Hensel was "capable" of harboring the requisite knowledge and intent. Dr. Ohlson agreed with Dr. Roberts' conclusion that Hensel was probably incapable of maturely and meaningfully reflecting on the consequences of his action. He could not, however, attribute this to a mental defect or illness; rather, he attributed it to Hensel's slower rate of development. Dr. Johnstone and Dr. Wetherhorn found no evidence of psychological impairment which would have prevented Hensel from forming the requisite criminal intent.

Evidence that Hensel was anxious, gullible, immature, and that his judgment was impaired would not necessarily warrant a finding that Hensel's capacity to form criminal intent was diminished. Many criminals exhibit one or more of these characteristics. At the post-conviction hearing, Hensel's attorney placed particular emphasis on his client's alleged incapacity to "maturely and meaningfully reflect" upon the gravity and consequences of the contemplated act. The specifics of this phraseology are drawn from *People v. Wolff*, 61 Cal.2d 795, 40 Cal.Rptr. 271, 394 P.2d 959, 975 (1964). *Wolff* involved a brutal homicide. With respect to such crimes, the degree to which the offender maturely and meaningfully reflected upon the gravity of his act is of unique and substantial importance.[58] In the context of the criminal offenses charged against Hensel, the ability

**56.** Dr. Johnstone characterized Hensel as "relevant, coherent, [and] without . . . serious internal distortions due to psychotic, neurotic or characterological disturbances."

**57.** Roberts testified that he felt Hensel was "unable to make any connection between what he was doing with the dynamite [and] the actual intent of the people who brought him the dynamite."

**58.** As explained by the Supreme Court of California in *People v. Wolff*, 61 Cal.2d 795, 40 Cal.Rptr. 271, 394 P.2d 959 (1964):

Dividing intentional homicides into murder and voluntary manslaughter was a recognition of the infirmity of human nature. Again *dividing the offense of murder into two degrees is a further recognition* of that infirmity and *of difference in the quantum of personal turpitude of the offenders.* * * * The victim of manslaughter or second degree murder is just as dead as is the victim of first degree murder. The law has fixed standards by which such *personal depravity of the offender;* i. e., the character of the particular homicide, *is to be measured.* When the homicide

to reflect maturely and meaningfully is not of similar consequence. As we have noted, diminished capacity, which focuses on the capacity of the defendant to harbor a specific mental element, may constitute a defense to any specific intent crime. Yet, the defendant's capacity to *reflect upon the gravity of his act* is of minimal consequence when the *act* is that of receiving stolen property or aiding and abetting burglary or destruction of property. In short, when the act is that of receiving stolen property or aiding and abetting property related crimes, we cannot attach the same significance to the defendant's capacity to reflect maturely and meaningfully as when determining the requisite mens rea for a particular degree of homicide.[59]

▆▆▆▆ The conflict in expert testimony was for the superior court to resolve. The superior court concluded that Hensel had failed to sustain his burden of proving that the psychological and psychiatric evidence was sufficient to change the result of the trial.[60] We hold that there was no abuse of discretion in reaching that conclusion. Other arguments advanced by Hensel with respect to the superior court's ruling on the issue of diminished capacity we find without merit.[61]

## II. BURGLARY: SUFFICIENCY OF THE EVIDENCE

Hensel, who was found guilty of burglary on the basis of accomplice liability, contends that there was insufficient evidence of his aiding and abetting the burglary to support the conviction. Specifically, he argues that the evidence produced by the prosecution

---

is perpetrated by means of poison, or lying in wait, or torture, or in the perpetration of or attempt to perpetrate the enumerated felonies the standard is definite and no difficulty in fixing the degree ensues. But when it is claimed that the homicide is by "any other kind of willful, deliberate, and premeditated killing" there is necessity for an appraisal which involves something more than the ascertainment of objective facts.

*Id.,* 40 Cal.Rptr. at 286–87, 394 P.2d at 974–75 (emphasis in original), *quoting People v. Holt,* 25 Cal.2d 59, 153 P.2d 21 (1944).

59. We intimate no view as to whether we accept California's concept of diminished capacity when the crime involved is homicide. *See People v. Wolff,* 61 Cal.2d 795, 40 Cal.Rptr. 271, 394 P.2d 959 (1964).

60. In its memorandum decision, the superior court concluded:

The petitioner has failed to sustain his burden of proof. While the psychiatric and psychological opinions expressed in the hearings on this petition do present some insights into Mr. Hensel's mental processes which were probably not available at the time of his trial, they simply do not add up to a basis for finding that he lacked the specific mental state of intent essential to the offenses for which he was convicted.

61. Hensel contends that his *motion for new trial* based on newly discovered evidence was denied by the superior court not on the basis of the evidence of diminished capacity, but on the basis of Judge Hanson's doubts concerning the ability of the correctional system to deal appro-

priately with a person in need of mental health treatment. We do not so read Judge Hanson's comments. We are also of the opinion that the superior court's ruling on Hensel's motion for new trial is not properly before us. The present appeal is from the court's denial of post-conviction relief and does not involve the court's ruling on the motion for new trial. While Hensel's statement of points on appeal incorporates those points raised in his earlier appeal from the conviction, the earlier appeal did not challenge the trial court's ruling on Hensel's motion for new trial.

Hensel also argues that the superior court failed to comply with the requirement of Criminal Rule 35(h) that the court make findings of fact. In pertinent part, Rule 35(h) provides:

The court shall make specific findings of fact, and state expressly its conclusions of law, relating to each issue presented.

As Hensel recognizes, the primary purpose of this requirement is to aid the appellate court in discharging its responsibilities. The specification of findings of fact by the superior court enables us to determine whether the facts are supported by substantial evidence and whether such facts justify the conclusions of law. The superior court's lengthy memorandum decision delineates sufficient factual findings and conclusions of law to allow us to discharge our appellate function. The critical finding made by the superior court was that Hensel did not sustain his burden to prove by a preponderance of the evidence that he lacked the mental elements required for the crimes of which he was convicted. This finding was supported by substantial evidence, and it supports the court's denial of post-conviction relief.

was not sufficient to establish the actus reus necessary to a finding of accomplice liability. The state contends that the evidence and the inferences drawn therefrom are sufficient to support the burglary conviction.

 We have previously discussed the actus reus required for accomplice liability.[62] Under *Mahle v. State,* 371 P.2d 21, 25 (Alaska 1962), the defendant must in some way aid, abet, assist, or participate in the criminal enterprise. Subsequent decisions have clarified the nature of this requirement. In *Thomas v. State,* 391 P.2d 18, 25 (Alaska 1964), we approved a jury instruction which read in part:

"Aid and abet" means to help, assist, or facilitate the commission of a crime, promote the accomplishment thereof, help in advancing or bringing it about, or encourage, counsel, or incite as to its commission.[63]

We have stated that mere foreknowledge of the criminal plans of others will not suffice for accomplice liability.[64] In addition, it is essential that an alleged accomplice "in some way 'associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed.'"[65]

Finally, what we said in *Evans v. State,* 550 P.2d 830 (Alaska 1976), emphasizes the necessity that the defendant commit some act which helps or facilitates the commission of the substantive crime. We stated:

Complicity is established only if there is conduct voluntarily undertaken for the purpose of participating or assisting in the completion of a crime.

*Id.* at 841. Not just any act of the defendant will suffice. The act must aid, abet, assist, or facilitate the commission of the particular substantive crime for which the state seeks to hold the defendant liable as an accomplice.[66]

*Carman v. State,* 602 P.2d 1255 (Alaska 1979), emphasizes the necessity that the defendant commit some identifiable act which aids and abets the substantive crime. In *Carman,* the defendant and another were convicted of armed robbery in a movie theater. They argued on appeal that the superior court improperly limited the jury's inquiry into the determination of whether two state witnesses were accomplices. One witness, Evans, testified that he had purchased two ski masks with his own funds knowing that they would be used in the robbery. As to Evans, we held that the jury could find him an accomplice to the robbery. *Id.* at 1261. The other witness,

---

62. *See* Part I(C) *supra.*

63. In a similar vein, we stated, in *Tarnef v. State,* 512 P.2d 923, 928 (Alaska 1973):

[T]he words "aid and abet" are used synonymously with various combinations of the words assist, advise, counsel, procure, encourage, incite and instigate.

64. *Daniels v. State,* 383 P.2d 323, 325 (Alaska 1963).

65. *Gordon v. State,* 533 P.2d 25, 29 (Alaska 1975), *quoting United States v. Peoni,* 100 F.2d 401, 402 (2d Cir. 1938).

66. This principle is illustrated in *Mahle v. State,* 371 P.2d 21 (Alaska 1962). The defendant was convicted of both larceny and burglary. The evidence indicated that four persons were present at the defendant's house when plans were finalized to break into a Sears store. Ahearn, one of those present, said he wanted nothing to do with the plan. The remaining three persons broke into the Sears store and returned with an unopened safe. At the request of the others, Ahearn helped pry open the safe, and was rewarded with a "couple of dollars." We held that when Ahearn helped in the final asportation and disposition of the property located inside the safe, he became an accomplice as a matter of law to the crime of *larceny.* We did not rule on Ahearn's possible liability as an accomplice to the burglary, but the decision illustrates the principle that an aider and abettor may incur accomplice liability for only one substantive crime, even though the perpetrators may have committed several. This principle applies to persons who aid, abet, assist, or encourage criminal conduct at any stage—before, during, or after the offense is committed. Careful analysis is required in this area, since we deal with broadening the scope of criminal liability to persons who may be remote in both time and space from the criminal conduct. Thus, we hold that the act which forms the basis for accomplice liability must in some way help the commission of the particular substantive criminal offense for which the state seeks to hold the defendant liable as an accomplice.

Drum, testified that he knew of the robbery plans and, in fact, had been present on an occasion when the defendant, in preparation for the robbery, had cut the telephone wires of the movie theater. Drum did not actually participate in the cutting of the wires. Upon these facts, we held that Drum could not be an accomplice to robbery because "there was no evidence that he actually did any overt act to help bring it about." *Id.* at 1261.

 In light of these principles, we hold that fair minded persons in the exercise of reasonable judgment[67] could conclude from the evidence, viewed in a light most favorable to the state,[68] that Hensel's guilt as an accomplice to the burglary was established beyond a reasonable doubt. The evidence, viewed most favorably to the state, would warrant a finding that Hensel provided the co-defendants with capped and fused dynamite knowing that they would return to the premises previously burglarized, plant the dynamite inside the bunkers, and explode the buildings.

Burglary involves the breaking and entering of a building with intent to steal or commit a felony in it. Evidence was presented from which it could be concluded that Hensel aided in the commission of the felony[69] by furnishing the dynamite and fuses as well as demonstrating how they could be used to destroy the bunker and its contents. Just as one who furnishes dyna-

mite and information how to blow up the safe in a bank may be held as an accomplice to the burglary of the bank, he aided and abetted the commission of the burglary of the storage magazine.[70]

## III. DOUBLE PUNISHMENT

 Hensel's last argument on appeal is that consecutive sentences for burglary and malicious destruction of property are not permissible under *Whitton v. State,* 479 P.2d 302 (Alaska 1970). The state concedes error on this point, recognizing that "the burglary and malicious destruction charges constitute essentially one course of conduct designed to accomplish one specific objective—the destruction of the Eagle River bunker and its contents." While Hensel's sentence on the malicious destruction conviction was imposed consecutively to the sentence received on the burglary conviction, Hensel also received a sentence on the receiving and concealing conviction which was imposed consecutively to the burglary conviction. Since the sentences on the receiving and concealing and malicious destruction convictions are identical—three years imprisonment with two suspended—it appears that Hensel was not prejudiced in terms of the total time he may be required to serve. The sentence, however, must be modified because collateral consequences may follow from Hensel's conviction of three offenses, rather than two.[71] Hence,

---

**67.** *McCurry v. State,* 538 P.2d 100 (Alaska 1975), *overruled on other grounds by Howe v. State,* 589 P.2d 421, 425 (Alaska 1979); *Davis v. State,* 369 P.2d 879 (Alaska 1962).

**68.** *Armstrong v. State,* 502 P.2d 440, 443 (Alaska 1972); *Condon v. State,* 498 P.2d 276, 278 (Alaska 1972).

**69.** At one point, in what we believe to be an apparent oversight, the state argues that the evidence was sufficient to hold Hensel liable as an accomplice to theft of the explosives and, by implication, the first burglary committed by the co-defendants. This, of course, is not the law. As noted in *Maines v. State,* 97 Okl.Cr. 386, 264 P.2d 361, 363 (1953):

> Breaking and entering being essential elements of the crime of burglary, no subsequent connection with property stolen as the result of a burglary can make one guilty of

burglary who was not connected with the original breaking and entry.

Our holding in *Daniels v. State,* 383 P.2d 323, 325 (Alaska 1963), bespeaks a similar rule.

**70.** The malicious or wanton injury to property of another is made a felony by AS 11.20.520. The breaking and entering of the powder magazines for the purpose of destroying the property thus constituted a burglary and the evidence was sufficient for the jury to find that Hensel assisted in the commission of the crime. We consider the intended felony requirement such an integral part of the burglary offense, that one aiding in the commission of that felony may be found guilty of aiding and abetting the burglary.

**71.** *See Whitton v. State,* 479 P.2d 302, 314 (Alaska 1970).

we remand to the trial court with instructions to vacate Hensel's sentence on the charge of malicious destruction of property. As thus modified, the judgment of the superior court is AFFIRMED.

BURKE, J., not participating.