**Sam AHWINONA, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. 4110.**

Supreme Court of Alaska.

Aug. 3, 1979.

---

3. *See* AS 33.15.180.

Bryan P. Timbers, Larson, Timbers & Van Winkle, Nome, for appellant.

George W. Edwards, Dist. Atty., Nome, Avrum M. Gross, Atty. Gen., Juneau, for appellee.

Before RABINOWITZ, C. J., and CONNOR, BOOCHEVER, BURKE and MATTHEWS, JJ.

## OPINION

BOOCHEVER, Justice.

Upon his plea of *nolo contendere,* Sam Ahwinona, Jr., was found guilty of second degree murder in violation of AS 11.15.030.[1] The superior court sentenced Ahwinona to life imprisonment, the maximum term allowed by law.[2] Ahwinona appeals this sentence, arguing that it is excessive and that the trial court failed to consider adequately the sentencing goal of rehabilitation.

Sam Ahwinona is a 22-year-old Alaska Native who suffers from chronic alcoholism and alcohol amnestic syndrome. Ahwinona's natural mother died when he was six years old. When his father remarried two years later, Ahwinona was exposed to the abuses of alcohol, as his father and stepmother drank to excess during his early teen-age years. The defendant himself started drinking at age fifteen, often to excess. His consumption of alcohol occasionally resulted in "blackouts," where he was unable to recall his behavior. When he drank, he was sometimes violent. He reports only two periods in which he was able to control his drinking, both of them while he was serving in the United States Army, which he did for approximately three and one-half years.

Ahwinona arrived in Nome, Alaska, on December 3, 1977, after receiving an undesirable discharge from the Army the previous day.[3] He visited with his grandparents for a short period of time, and then proceeded to the home of his parents, where he began to drink. He left his parents' house shortly after noon and proceeded to the downtown area of Nome, where he resumed his drinking. Ahwinona met his father at the Polar Bar, where they each ordered a beer. Due to lack of money, neither could pay for the beer, and it was taken away before it was consumed. The defendant's father tried to borrow some money from the bar owner, but the owner refused.

After talking with his father for a few more minutes, Ahwinona proceeded up a stairway leading to apartments located over the Polar Bar. He entered an apartment and found Franca Cicone, a fifty-one year old Italian national who was temporarily

---

1. AS 11.15.030 specifies:

    *Second Degree Murder.* Except as provided in §§ 10 and 20 of this chapter, a person who purposely and maliciously kills another is guilty of murder in the second degree, and shall be sentenced to imprisonment for a term of not less than 15 years to life.

2. *Id.*

3. He received an undesirable discharge resulting from three periods during which he was absent without leave. One of these periods occurred in Nome between April and August 1977, ending when Ahwinona was transferred to the military by state authorities who were holding him on a charge of carrying a concealed weapon, a knife.

residing in Nome with her husband. Ahwinona, who was carrying a knife, cut the victim's throat and repeatedly stabbed her. Apparently there was some sort of struggle, for Ahwinona received a severe cut on the left wrist, and minor wounds to two fingers on the right hand. The victim escaped the apartment, and ran down the stairs leading to the bar. She collapsed and died a few moments later from loss of blood. In the meantime, Ahwinona went through the victim's purse, leaving blood stains on several objects contained therein, but he apparently took nothing.[4] The defendant left the apartment and proceeded to the main electrical switching panel where he cut off the power,[5] throwing the bar into almost total darkness. Ahwinona stumbled down the stairs into the bar, where he told bystanders that someone upstairs had cut him.

A Nome police officer, believing Ahwinona to be a victim, escorted him to the police station for the purpose of obtaining a statement. The defendant, however, pulled his knife from a shoulder harness and attacked the police officer. Ahwinona inflicted a superficial wound on the officer's abdomen. The officer subdued Ahwinona and arrested him.

The defendant remembers nothing of the incident, suggesting that he suffered from an alcohol "blackout" during the time of the criminal act.[6] This theory is supported by the defense's expert medical witness, Dr. Wolf. Dr. Wolf diagnosed Ahwinona as suffering from chronic alcoholism and alcohol psychosis; specifically alcoholic amnestic syndrome. In his written psychiatric report, Dr. Wolf concluded:

[T]hese individuals who have the alcoholic amnestic syndrome are when sober, no danger to themselves or others, they do not show any major problems when sober, however, they are a danger to themselves or others whenever they drink. . . . I would feel very strongly that both [Ahwinona's] involvement in an intensive alcoholism treatment program and his subsequent daily use of antabuse for the rest of his life should be involved in a plan for him whether or not he has to have some time within the correctional system. If he were only to be involved with institutional time, he may very well return to drink and be just as much danger to himself or others upon the day of his release.

Based in part upon the psychiatric evaluations of Ahwinona, the trial court sentenced the defendant to life imprisonment, as recommended by the pre-sentence report.

The trial court found that, in this particular case, isolation of Ahwinona from society because of the danger he posed to the public was the most weighty goal influencing its sentencing decision. To a lesser extent, the court stressed that its sentence was designed to deter the offender and others from engaging in similar conduct and to reaffirm societal norms. Finally, the sentencing judge stated that he could do little to effect the rehabilitation of Ahwinona and that the prison system offered little in the way of rehabilitative promise.[7]

■■■ Ahwinona contends that the sentencing court failed to consider adequately the sentencing goal of rehabilitation.[8] The

4. According to the state, the victim had no money in the purse.

5. Ahwinona's blood was found on the main electrical switching panel.

6. Ahwinona's brother and sister testified that when he left his parents' house, he appeared to be intoxicated or at least "half drunk." On the other hand, the owner of the Polar Bar stated that Ahwinona did not appear to be drunk just prior to the incident.

7. Specifically, the sentencing judge stated:
Therefore, based upon those factors and considering that your rehabilitation into a func-

tioning member of society is important but it's not the most important factor because of how dangerous you are and how serious the crime was and finding that I as a judge have very little to do with your rehabilitation that the prison system offers little for rehabilitating alcoholics such as yourself, society offers very little, that doesn't mean [though] that society cannot demand to be protected from you.

8. In *Shagloak v. State*, 582 P.2d 1034, 1039 (Alaska 1978) (citations omitted), we stated:
Upon passing sentence, the trial court must give consideration to the goals of rehabilita-

court did not give priority to rehabilitation of Ahwinona in imposing sentence, but neither is it required to do so.[9] It is for the sentencing judge to determine the priority and relationship among the various sentencing goals in any particular case.[10] More importantly, however, we believe that the trial court adequately considered the goal of rehabilitation and properly concluded that regardless of the length of sentence imposed or the availability of alcohol programs in prison, Ahwinona is not likely to be rehabilitated in prison.

Dr. Wolf found that Ahwinona suffered from an organic brain syndrome which prevented him, at times, from conforming his behavior to the requirements of the law. The syndrome is characterized by an inability to resist the first drink, which, if consumed, leads to additional alcohol consumption and, sometimes, an eventual "blackout." At the sentencing proceeding, Dr. Wolf stated:

> I think a 5-year period in which this man were sober, *beyond his period of incarceration,* probably would very well get him into a very different way of lifestyle. As I said I think he absolutely must continue to protect himself but I, in answer to your question, I think there's a good chance that *after a period of incarceration, and then 5 years beyond that* that . . . habit should very well be set in into a new lifestyle. [emphasis added]

Dr. Wolf's comments make clear that Ahwinona will not be rehabilitated in prison. Complete rehabilitation will occur only after Ahwinona has been released from prison and has integrated himself into a voluntary, non-alcoholic lifestyle. Given this diagnosis, it will not be possible to determine whether or not Ahwinona has in fact been rehabilitated until he is released from prison. Thus, in the special circumstances of this case, the goal of rehabilitation shrinks in significance when compared to the other sentencing goals. Protection of society through isolation of the offender becomes a major concern.[11] Given the extreme danger Ahwinona poses to both himself and society if he is not cured of alcoholically-induced periods of violence, we cannot say that the trial judge erred in determining that the defendant must be incarcerated for a substantial length of time.

What we have said also answers the defense's contention that, under *Abraham v. State,* 585 P.2d 526 (Alaska 1978), Ahwinona is entitled to an evidentiary hearing exploring the prospects for his rehabilitation through alcohol treatment programs while in prison. Under *Abraham,* Ahwinona has a right to receive rehabilitative treatment relating to his use of alcohol. *Id.* at 533. The sentencing court recommended that Ahwinona participate in a program of alcohol rehabilitation. Ahwinona argues that because the trial court did not conduct an evidentiary hearing, it mistakenly concluded that the prison system could do little to cure his alcoholic condition. However, Dr. Wolf's testimony established that regardless of the treatment afforded Ahwinona in prison, five years of post-incarceration, non-drinking lifestyle would be required in order for the defendant to be rehabilitated.

Ahwinona received a sentence of life imprisonment, the maximum allowed by law.

tion, isolation of the offender, deterrence of the offender and others criminally inclined and community condemnation of the offender. . . . The goal of rehabilitation is a touchstone of penal administration, and is mandated by Article I, Section 12 of our Constitution. In light of the importance of rehabilitation in the sentencing process, we will affirm sentences which disregard rehabilitation as an alternative only where sufficiently articulated reasons are given for that decision or where these reasons appear clear on the face of the sentencing proceedings.

9. *Bailey v. State,* 548 P.2d 373, 375 (Alaska 1976).

10. *Asitonia v. State,* 508 P.2d 1023, 1026 (Alaska 1973).

11. We note that Dr. Rothrock disagreed with Dr. Wolf's diagnosis of alcoholic amnestic syndrome and considered Ahwinona to be a remorseless individual with an antisocial personality. Dr. Rothrock's opinion supports the trial court's conclusion that an extended period of incarceration was necessary because of Ahwinona's dangerousness.

He contends that the sentence is excessive. We must determine whether the sentencing court was clearly mistaken in imposing this particular sentence.[12]

■ We have stated on many occasions that maximum sentences should not be imposed without some foundation for characterizing the defendant as the worst type of offender.[13] The sentencing judge characterized Ahwinona as a "particularly dangerous offender" and Ahwinona's homicide as "a particularly serious 2nd degree murder."[14]

The brutality and violence involved in the commission of this particular crime have been detailed above. We have noted previously that violent crimes involving physical injury to innocent people are to be regarded as our most serious offenses and are not to be treated lightly.[15] Ahwinona's history of violence was also considered by the sentencing court. The defendant admitted to an incident in 1972 in which he fired several rounds from a .22 caliber pellet gun into a State Trooper's house. The defendant has been in and out of various foster homes and youth correctional facilities since the age of 16 because of violent outbursts.[16] Finally, the court was heavily influenced by Ahwinona's tendency to become violent when intoxicated and his inability to resist the first step leading to that state. Based upon the expert medical testimony, the sentencing court concluded that a long period of incarceration was necessary in order to protect the public and to assure that Ahwinona would be placed in a controlled environment. Under these circumstances, we cannot say that the trial court was clearly in error in classifying Ahwinona as a worst type offender or in sentencing him to imprisonment for life.

The sentence is AFFIRMED.

12. *McClain v. State,* 519 P.2d 811, 813–14 (Alaska 1974).

13. *See, e. g., Sielak v. State,* 581 P.2d 226, 227 (Alaska 1978); *Galaktionoff v. State,* 486 P.2d 919, 924 (Alaska 1971).

14. There is no requirement that the sentencing judge specifically utter the words "worst offender" so long as there is a basis for applying the characterization to the particular defendant. *See Jacinth v. State,* 593 P.2d 263, 267 (Alaska 1979).

15. *Creed v. State,* 573 P.2d 1379, 1380 (Alaska 1978).

16. The defendant has no prior adult criminal record, but we have stated that the lack of a prior criminal record does not preclude a finding that the defendant is the worst type of offender. *Wilson v. State,* 582 P.2d 154, 156 (Alaska 1978).