Emmett EVANS, Appellant,

v.

STATE of Alaska, Appellee.

No. 4086.

Supreme Court of Alaska.

May 21, 1982.

Mary E. Greene, Asst. Public Defender, David C. Backstrom, Deputy Public Defender, Fairbanks, and Brian Shortell, Public Defender, Anchorage, for appellant.

W. H. Hawley, Jr., Asst. Atty. Gen., Anchorage, and Avrum M. Gross, Atty. Gen., Juneau, for appellee.

Before RABINOWITZ, C. J., CONNOR, BURKE and MATTHEWS, JJ., and ROWLAND, Superior Court Judge.*

## OPINION

RABINOWITZ, Chief Justice.

Emmett Evans was found guilty of second degree murder and sentenced to thirty years' imprisonment. He appeals his conviction on the grounds that the superior court erred both in refusing to permit the jury to consider his insanity defense and in excluding certain evidence. Evans also appeals his thirty-year sentence as excessive. We are not persuaded that any reversible error occurred as to the conviction, nor do we think the sentence is clearly mistaken. Thus, we affirm.

Shortly after 2 a.m. on December 4, 1977, the victim, Joe Simmons, entered the Yukon Inn in Galena with his companion, Ann Burgett. They took empty seats at one end of the bar. Apparently, Simmons took the seat of Evans, who was either behind the bar counter or playing pool at the time. The testimony reveals that Evans and Simmons had an argument about the seat. Burgett testified that Evans said Simmons would get up and give his seat to Evans the next time he entered the bar.

Evans then left the bar with some friends who gave him a ride home. Approximately twenty minutes later, he returned to the bar. The testimony reveals that on entering the bar, Evans paused to clean his glasses. He then stood at the bar about fifteen feet from Simmons and ordered a beer. Approximately four or five minutes later, Evans pulled out a gun, aimed, and shot the victim. The bullet struck the victim in the head, killing him instantly.

Immediately after the shooting, two people wrestled Evans to the floor and relieved him of his weapon. One testified that Evans said, "I told you so," and "I told him so." They held Evans until the police chief arrived, about twenty minutes later.

The police chief read Evans his *Miranda* rights and had Evans's roommate sit with him while the chief attended to other duties. Evans and his roommate sat together for approximately thirty to forty-five minutes. During this time, Evans told his roommate that he had had an argument with the victim and had shot him. Evans's roommate testified that Evans did not appear intoxicated, had no problems with physical coordination, and had no difficulty grasping the events which were occurring.

Prior to trial, Evans gave notice of his intent to rely on a defense of insanity; specifically, that he lacked criminal responsibility due to mental disease or defect. Evans's insanity defense rested on testimony by Dr. Wolf, a psychiatrist, whose diagnosis was that Evans suffers from alcohol amnestic syndrome ("AAS").

According to the testimony of Dr. Wolf, AAS is an organic brain syndrome induced

---

* Rowland, Superior Court Judge, sitting by assignment made pursuant to article IV, section 16 of the Constitution of Alaska.

by excessive alcohol consumption.[1] This is closely related, if not identical, to the theory of "alcohol blackout" which Dr. Baertschy attempted to present in *Handley v. State*, 615 P.2d 627 (Alaska 1980).

Dr. Wolf further testified that AAS prevented Evans from having the capacity to appreciate the wrongfulness of his acts, to conform his conduct to the requirements of the law, to deliberate his actions, to premeditate, and to form an intent on the morning in question. Dr. Wolf also testified, however, that Evans's mental disease or defect is only manifested when Evans is under the influence of alcohol, and that when Evans is sober he is responsible for his actions.

The evidence shows that Evans drank a large amount of beer over approximately an eight-hour period before the shooting. The record reflects that Evans drank at least ten, and perhaps as many as twenty, beers during that time. The testimony also established that Evans was not stumbling or slurring his speech. Evans testified that he had been involved in several violent incidents with weapons when he was intoxicated. His testimony reflects that he is aware of his blackouts and his tendency toward violent behavior when intoxicated.

Testimony by both state and defense experts established that Evans is an alcoholic. However, the state and defense experts disagreed on the amount of control Evans has over his drinking. Defense experts maintained that Evans is a chronic addictive alcoholic and therefore is unable to control his drinking. The state experts maintained that although Evans is an alcoholic, he can control his drinking. The state supported this contention chiefly with Evans's own statements to the psychiatric experts. Evans said he does not drink when he works, has gone long periods (thirteen weeks) without drinking, and can stop if he wants to. There was also some testimony that there were a couple of days before the

shooting during which Evans was not drunk.

Evans testified that he does not recall anything that happened between the time he left the Yukon Inn and the time he was wrestled to the floor after he shot the victim. Apparently during this period he received a ride home, which took about five minutes, and then armed himself by strapping on his shoulder holster and placing his .44 caliber revolver in the holster. The testimony shows that Evans did not have the weapon when he was in the bar earlier, and that he did not have a car, so he apparently walked the half mile from his home back to the bar. The police chief, having walked this distance, testified that it is approximately an eight-minute walk.

To confirm his diagnosis of Evans's AAS, Dr. Wolf performed an experiment in which Evans drank beer during a four-hour period while EEG tracings and blood tests were taken. The experiment also included an intelligence test and observation of Evans's emotions. The purpose of this experiment was to recreate a blackout. Evans drank thirteen 12-ounce cans of beer during the experiment and his blood alcohol level reached 210 milligram percent (.210). Dr. Wolf testified that he determined that Evans had had a blackout during the experiment because Evans's mood had changed and the EEG tracings had become abnormal. On being questioned the morning after the experiment, Evans could not recall events which took place during the experiment at the time Dr. Wolf observed the blackout. This morning-after questioning of Evans was tape-recorded. Dr. Wolf intended to tape-record the entire experiment but, apparently through inadvertence, insufficient tape allowed only the recording of the second and third hours of the four-hour experiment.

The defense theory, based on Dr. Wolf's testimony, is that Evans entered a blackout

1. Dr. Wolf relies on an article by psychiatrist R. S. Ryback as a basis for his AAS theory. Ryback's article is apparently the original work in which an alcohol blackout theory of mental disease is espoused. Ryback does not, however, discuss the sanity of an individual in a blackout. Ryback, *The Continuum and Specificity of the Effects of Alcohol on Memory*, 32 Q. J. of Studies in Alcohol 995–1016 (1971).

state shortly after he left the Yukon Inn and remained in a blackout until he was wrestled to the floor after the shooting. At trial, after an extensive offer of proof by Dr. Wolf, the superior court ruled that Dr. Wolf's testimony was not admissible on the issue of insanity but was admissible to show diminished capacity.

Dr. Wolf testified extensively about AAS, the experiment, and Evans's reactions and conversation during the experiment. Dr. Wolf testified from his personal observation of the experiment and from log notes he had prepared at that time. The superior court refused to allow the jury to hear the taped portions of the experiment, ruling that the tape was cumulative and could prejudice the jury. The superior court also refused to allow Dr. Wolf to testify to statements made by Evans to him in which Evans claimed a lack of memory of the murder and other past drinking incidents. The superior court found these statements to be hearsay and excludable. Defense counsel then elected to place Evans on the stand for the limited purpose of curing this hearsay problem. The court agreed to limit Evans's testimony to the blackout incidents.

### I. Defense of Insanity

The superior court precluded Evans from asserting a defense of insanity under AS 12.45.083(a) by excluding any testimony on that issue. Evans asserts that this ruling was erroneous.

AS 12.45.083(a) provides:

A person is not responsible for criminal conduct if at the time of the conduct, as a result of mental disease or defect, he lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law.

We have previously dealt with the interaction of this statute and the problems of alcoholism. In *McIntyre v. State*, 379 P.2d 615, 616–17 (Alaska 1963), we adopted the majority rule that draws a distinction between the mental effect of intoxication which is the result of a particular alcoholic bout and an alcoholic psychosis such as delirium tremens, resulting from long-continued habits of excessive drinking. We concluded that the former does not amount to legal insanity, whereas the latter may. In *McKinney v. State*, 566 P.2d 653, 664–65 (Alaska 1977), *on rehearing*, 570 P.2d 733 (Alaska 1977), we equated this distinction with that drawn by more recent cases between those who lose control as a result of a particular bout and those for whom alcohol related or induced insanity is a pre-existing condition. We also emphasized in *McKinney* the importance of the defendant's capability to control his drinking: "[W]here an individual has knowledge of the adverse effects of his drinking and can choose whether or not to drink, society can legitimately expect him to conform his conduct to its demands." *Id.* at 665. *See also O'Leary v. State*, 604 P.2d 1099, 1103 n.7 (Alaska 1979), where we noted that the statutory concept of voluntariness, under former AS 11.70.030, is separate from an insanity defense.

Statutorily, voluntary intoxication was, under former AS 11.70.030, a valid ground for negating the motive, purpose, or intent aspect of a crime which requires such as an element of the offense.[2] This carries the implication, supported in the case law, that

---

2. Former AS 11.70.030, which was in effect at the time of trial, reads:

*Intoxication as defense.* (a) An act committed by a person while in a state of voluntary intoxication is not less criminal because he was intoxicated. However, when the existence of a particular motive, purpose, or intent is a necessary element to constitute a particular species, or degree of crime, the jury may take into consideration the fact that the defendant was intoxicated at the time in determining the purpose, motive, or intent with which he committed the act.

(b) As used in this section, 'intoxication' refers to intoxication from the use of a drug in violation of AS 17.10 or 17.12 as well as to intoxication from alcohol.

Former AS 11.70.030 has been repealed and replaced by AS 11.81.630, which provides:

*Intoxication as a defense.* Voluntary intoxication is not a defense to a prosecution for an offense, but evidence that the defendant was intoxicated may be offered whenever it is relevant to negate an element of the offense that requires that the defendant intentionally cause a result.

voluntary intoxication will not establish an insanity defense.[3] The case law is also clear that involuntary intoxication does constitute a valid defense. This is most clearly shown when the intoxication is the result of the force, duress, fraud, or contrivances of another.[4]

The problem presented when the intoxication is claimed to have been involuntary because compelled by internal force or compulsion—i.e., some variety of alcoholism—has been dealt with differently by different courts. Some have completely rejected any such defense, holding that the compulsion to drink must be external.[5] Other courts have been considerably more sympathetic in giving recognition to the alcoholic's asserted internal compulsion.[6]

Alaska has already, in the context of the constitutional prohibitions against cruel and unusual punishment, rejected the suggestion that chronic alcoholism automatically relieves offenders of their criminal responsibility. In *Vick v. State*, 453 P.2d 342, 344–45 (Alaska 1969), this court affirmed a sentence imposed on a chronic alcoholic for being drunk in public. In a unanimous opinion written by Justice Dimond, the reasons for our ruling were given as follows:

> The effect of such a concept is to do away with free will so far as the chronic alcoholic is concerned. One suffering from the disease of alcoholism has a compulsion to drink and to get drunk in public, and since this compulsion is said to be irresistible and not the product of the exercise of one's will, it is said he cannot

be held criminally responsible for public drunkenness. The inevitable result of such a holding is that the chronic alcoholic would also have to be relieved of the legal consequences of other crimes committed while under the influence of alcohol. One may not escape that conclusion. If the alcoholic's public display of drunkenness is not his act because he was unable to resist the compulsion to drink to excess, then other things he does while in that intoxicated state would also not be his act—would not be the product of the exercise of his will. Thus, the person who becomes intoxicated involuntarily would have to be excused from acts performed while intoxicated, such as murder, rape, assault and battery, and others.

We are unwilling to go this far.... Saying without more that one "loses the power of self-control with respect to the use of alcoholic beverages" fails to make a distinction between loss of self-control once an individual has commenced to drink and loss of control which makes it impossible for him to abstain from drinking in the first place. This is a crucial distinction, because presumably a person would have to display both characteristics before he could hope to establish that his public drunkenness was ungovernable and unwilled. To say that appellant suffers from both a "physical compulsion and mental obsession" concerning the consumption of alcoholic beverages is not to say that such compulsion and obsession were so completely overpowering that ap-

---

**3.** This was our ruling in *McKinney*, 566 P.2d at 664–66.

**4.** *See* Annot., 73 A.L.R.3d 195, 205–08 (1976).

**5.** In *State v. Palacio*, 559 P.2d 804, 806 (Kan. 1977) (emphasis in original), the court said:
> Defendant contends that the evidence before the court established that he was a chronic alcoholic, that he was thus compelled by an "irresistible force" to partake of alcoholic beverages, that his intoxication was therefore involuntary, and that the court erred in failing to so instruct the jury. We disagree.
> The "irresistible force" [necessary to establish involuntariness] ... does not mean habit, desire, or any other type of *internal* com-

pulsion. It means that intoxicants or drugs were forcibly, unwittingly or unknowingly ingested by or administered to the defendant. "Irresistible force" means physical compulsion by another, trickery, deception, or other type of *external* force. As a matter of law, the defendant, a chronic alcoholic but a person of average intelligence and mental capacity and whose actions were rational when he was sober, was not involuntarily intoxicated. The district court was correct in its interpretation of the law and in the instructions which it gave to the jury.

**6.** *See Easter v. District of Columbia*, 361 F.2d 50 (D.C.Cir.1966); *Driver v. Hinnant*, 356 F.2d 761 (4th Cir. 1966).

pellant was incapable of not taking the first drink, which in turn led to successive drinks and an eventual state of inebriation.

Furthermore, there is yet much to be learned about alcoholism from a medical point of view. As the United States Supreme Court has pointed out in *Powell v. Texas*, [392 U.S. 514, 88 S.Ct. 2145, 20 L.Ed.2d 1254 (1968),] there is no agreement among members of the medical profession about what it means to say that alcoholism is a disease, and there is substantial disagreement as to the manifestations of the disease called alcoholism. We agree with the Supreme Court when it said:

> We are unable to conclude * * * on the current state of medical knowledge, that chronic alcoholics in general * * * suffer from such an irresistible compulsion to drink and to get drunk in public that they are utterly unable to control their performance of either or both of these acts and thus cannot be deterred at all from public intoxication. [392 U.S. at 535, 88 S.Ct. at 2155, 20 L.Ed.2d at 1269.]

*Id.* at 344–45 (footnotes omitted).

The state urges us to adopt a standard which would, in effect, render an accused's intoxicated state irrelevant to the issue of insanity. If a pre-existing recognized mental disease or defect is severe enough to render the intoxication involuntary, then, according to the state, it must be severe enough to constitute an insanity defense by itself without regard to the intoxicated state of the accused.[7] We think the state's position is a salutary one and adopt it.

■ In our view, the rule which should govern in Alaska is that voluntary intoxication will not support an insanity defense, and that all intoxication is to be regarded as voluntary unless it is unknowingly or externally compelled. This rule has been accepted in many jurisdictions.[8] It is consistent with the traditional common law view of individual responsibility,[9] as well as with the statute which governs this case, former AS 11.70.030, and with the statute now in effect, AS 11.81.630.[10]

■ Given the pervasive problems in Alaska of criminal acts committed by those who are drunk we think the better rule is one which views the accused's voluntary state of intoxication as irrelevant to the issue of insanity.[11] Since Evans's intoxication was voluntary under the rule we have adopted today, we hold that the superior court did not err in concluding that the evidence presented would not support an insanity defense.[12]

---

7. *See Evilsizer v. State*, 487 S.W.2d 113, 116 (Tex.Cr.App.1972), in which the court said:
 [I]f the pre-existing condition of mind of the accused is not such as would render him legally insane in and of itself, then the recent use of intoxicants causing stimulation or aggravation of the pre-existing condition to the point of insanity cannot be relied upon as a defense to the commission of the crime itself.

8. *State v. McNally*, 336 So.2d 713, 715 (Fla. App.1976); *McLaughlin v. State*, 236 Ga. 577, 224 S.E.2d 412, 414 (1976); *People v. Walker*, 33 Ill.App.3d 681, 338 N.E.2d 449, 454 (1975); *State v. Hall*, 214 N.W.2d 205 (Iowa 1974); *State v. Booth*, 169 N.W.2d 869 (Iowa 1969); *State v. Palacio*, 559 P.2d 804, 806 (Kan.1977); *City of Minneapolis v. Altimus*, 306 Minn. 462, 238 N.W.2d 851, 855–57 (1976); *Evilsizer v. State*, 487 S.W.2d 113, 116 (Tex.Cr.App.1972); *Loveday v. State*, 74 Wis.2d 503, 74 Wis.2d 503, 247 N.W.2d 116, 120–22 (1976). *See also State v. Herrera*, 32 Or.App. 397, 574 P.2d 1130, 1137 (1978) (Schwab, C. J., concurring). *See gener-*

*ally* Annot., 73 A.L.R.3d 195 (1976); Annot., 8 A.L.R.3d 1236, 1239–40 (1966).

9. *See, e.g., Vick v. State*, 453 P.2d 342, 344–45 (Alaska 1969).

10. *See note 2 supra.*

11. In so doing, we specifically disavow and overrule any indications to the contrary in *O'Leary v. State*, 604 P.2d 1099 (Alaska 1979); *McKinney v. State*, 566 P.2d 653 (Alaska 1977), *on rehearing*, 570 P.2d 733 (Alaska 1977); and *McIntyre v. State*, 379 P.2d 615 (Alaska 1963).

12. Recognizing that an alcoholic may also be insane, we further agree with the state's position that the insanity defense is available only to those alcoholics who, when sober, are insane and that in judging their insanity while sober their inability to restrain themselves from taking a drink may not be considered. *Cf. O'Leary v. State*, 604 P.2d 1099, 1102 (Alaska 1979).

## II. Evans's Statements to Dr. Wolf

Evans's second contention is that the superior court erred in excluding certain statements Evans made to Dr. Wolf. During Dr. Wolf's examination of Evans, the latter said he was unable to recall the shooting. Evans also told Dr. Wolf that he did not recall other violent incidents which had occurred when he was intoxicated. These incidents were related to Evans by friends. The superior court ruled that Evans's statements to Dr. Wolf were hearsay and excludable.

■ Evans argues that that these statements come under an exception to the hearsay rule. Alaska Rules of Evidence 803 and 804 provide for exceptions to the hearsay rule. Subsection (4) of Rule 803 provides for the admissibility of

[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

Thus, Evans's statements to Dr. Wolf would be admissible under Alaska's present Rules of Evidence. These rules did not become effective, however, until August 1, 1979. The trial in this case took place in April 1978. Apparently, the proposed Alaska Rules of Evidence were available at the time of trial. The state argues, and the record reflects, that defense counsel did not bring the proposed rules to the attention of the superior court. Neither did defense counsel cite to the superior court the identical Federal Rule of Evidence, promulgated in 1975.

A majority of courts at common law distinguished between statements made to a physician for treatment and statements made to a physician for litigation. Generally, statements made for treatment were excepted from the hearsay rule because their reliability was assured by the patient's belief that treatment effectiveness depended on the accuracy of the statements. This rationale does not apply to statements made solely for the purpose of litigation and a majority of courts have excluded such statements as hearsay. C. McCormick, Law of Evidence § 193, at 694 (E. Cleary 2d ed. 1972).

In explaining its ruling which precluded the introduction of Evans's statements, the superior court observed that Evans's statements were not made for the purpose of treatment and that his defense could not be based entirely on hearsay. In view of the foregoing, we cannot conclude that the superior court erred at the time it made its ruling on the statements in question.

■ Evans argues that these statements would also be admissible under Alaska Rule of Evidence 703, which provides:

*Basis of Opinion Testimony by Experts.*

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. Facts or data need not be admissible in evidence, but must be of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject.

The state asserts that the underlying facts would be inadmissible as hearsay, and that they would come within the ambit of Alaska Rule of Evidence 705(c) which provides:

*Balancing Test—Limiting Instructions.* When the underlying facts or data would be inadmissible in evidence for any purpose other than to explain or support the expert's opinion or inference, the court shall exclude the underlying facts or data if the danger that they will be used for an improper purpose outweighs their value as support for the expert's opinion. If the facts or data are disclosed before the jury, a limiting instruction by the court shall be given upon request.

Thus, the superior court could reasonably have concluded that the statements would have been used for an improper purpose— *i.e.,* to prove the truth of what was said.

Given the former position of the Alaska case law on this point, and the limited basis on which such statements can possibly be

admitted under our new rules of evidence, we are convinced that the superior court did not commit error in excluding the questioned statements.

 At trial, Evans elected to take the stand and testify for the limited purpose of curing the hearsay problem relating to his statements to Dr. Wolf. Evans argues that this dilemma violated his rights against self-incrimination. In general, a defendant who chooses to testify waives his privilege against compulsory self-incrimination. *Harrison v. United States*, 392 U.S. 219, 222, 88 S.Ct. 2008, 2010, 20 L.Ed.2d 1047, 1051 (1968). Evans argues that the only reason he testified was to cure the hearsay problem, and that since the hearsay rule is one based on "policy," it should be subordinated when it conflicts with his constitutional rights. The single case cited by Evans, *Salazar v. State*, 559 P.2d 66 (Alaska 1976), involved balancing the husband-wife privilege of confidential marital communications against the defendant's constitutional right to effectively confront a witness. The defendant did not have it within his power in that case to preserve his constitutional right and impeach the witness other than by subordinating the privilege. Here, on the other hand, exclusion of the doctor's testimony did not prevent Evans from remaining silent—it only made it less advantageous for him to do so. Evans did not possess a constitutional right to have his hearsay statements to the doctor placed in evidence. A waiver of the right against self-incrimination is no less effective because the defendant may have been motivated to take the witness stand only by reason of the strength of the evidence against him. *Harrison v. United States*, 392 U.S. 219, 222, 88 S.Ct. 2008, 2010, 20 L.Ed.2d 1047, 1051 (1968). Thus, we do not find that the superior court's refusal to admit this evidence violated Evans's rights against compulsory self-incrimination.

## III. Experiment Tape Recording

 The superior court also excluded the tape recording of Dr. Wolf's experimental attempt to recreate an alcohol blackout.

The court ruled that there was a great risk of prejudicial effect on the jury and that the tape was cumulative. Evans asserts that this ruling was error.

Evans argues that the tape is admissible under *Hampton v. State*, 569 P.2d 138, 146 (Alaska 1977), *appeal dismissed and cert. denied*, 434 U.S. 1056, 98 S.Ct. 1225, 55 L.Ed.2d 757 (1978), and *Bentley v. State*, 397 P.2d 976, 978 (Alaska 1965). Those cases hold that a tape recording is not rendered inadmissible by omissions unless they are so substantial that they make the recording untrustworthy. In the case at bar, two hours, or one-half of the total time of the experiment, were admittedly omitted from the tape; however, the fact that the tape was incomplete was not an issue at trial. The state argues that the contents of the tape recordings in *Hampton* and *Bentley* focused on a crucial issue at trial. In *Hampton*, the tape contained the defendant's confession. In *Bentley*, the tape contained an inconsistent statement by a key witness. The state argues that *Hampton* and *Bentley*, although they do stand for the proposition that an otherwise admissible tape recording may not be excluded unless it contains substantial omissions, are applicable only to taped evidence which is crucial to the trial; thus those holdings are inapplicable here, since the taped evidence was merely cumulative to Dr. Wolf's testimony.

The superior court did not exclude the tape because of any omission but because of its possible prejudicial effect on the jury. Evans argues that jury instruction 20 cautioned the jurors not to view the experiment as evidence of what occurred the morning of the shooting and that this was sufficient to minimize any possible prejudice.

The standard for review in such instances is whether the trial court abused its discretion. The state relies on *Menard v. State*, 578 P.2d 966 (Alaska 1978), where this court held that "[t]he trial court may exclude relevant evidence if it finds that its probative value is outweighed by the risk that the evidence will have a prejudicial effect on the jury, confuse the issues, or mislead

the jury." *Id.* at 968. *See* Alaska R.Evid. 403.

The tape apparently contains crying and sobbing by Evans, and the superior court expressed concern that the jury might view the tape as evidence of Evans's condition on the morning of the shooting. Further, since Dr. Wolf had testified extensively about the experiment, the superior court also found the tape to be cumulative. Given these circumstances we hold that the superior court did not abuse its discretion in the matter.

### IV. Sentence

At the time the thirty-year sentence was imposed, Evans was thirty-two years old. The crime of second degree murder was punishable by a sentence of fifteen years to life imprisonment. *See* former AS 11.15.030.[13] Evans had been employed as a firefighter, a laborer, and an electronics technician since serving a tour of duty in the Navy. His only prior offense had been a misdemeanor conviction in 1971 for careless use of firearms. From the record it appears that this earlier offense also occurred during a drinking bout.

The root of Evans's problem is clearly alcoholism. The Simmons death appears to be the end product of an extended series of drunken acts of violence and mishandlings of weapons on Evans's part. Evans has demonstrated that he is a serious threat to society. In cases such as these, especially given a history of similar incidents, isolation of the offender and community condemnation must, as the superior court noted, be significant concerns in sentencing.

In *Ahwinona v. State*, 598 P.2d 73 (Alaska 1979), we affirmed a life sentence—the maximum penalty—for a second degree murder conviction in which the killing was especially brutal, but also occurred as a result of a drunken bout by an alcoholic who had a prior history of violence. We cannot find in this similar case that the superior court was clearly mistaken[14] in imposing a sentence of thirty years.

AFFIRMED.

---

**13.** Under the current statute, AS 12.55.125(b), second degree murder is punishable by a sentence of 5 to 99 years.

**14.** *See McClain v. State*, 519 P.2d 811, 813–14 (Alaska 1974).